07-3958-cr
USA v. Josephberg

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Argued: October 23, 2008          Decided: April 9, 2009)

Docket No. 07-3958-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

RICHARD JOSEPHBERG,

Defendant-Appellant.

_____

Before: KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, Judge, convicting defendant of various tax offenses in violation of 26 U.S.C. §§ 7201, 7203, 7206, and 7212(a), and 18 U.S.C. § 371, and health care fraud in violation of 18 U.S.C. §§ 1347 and 2.

Affirmed.

STANLEY J. OKULA, Jr., Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Katherine Polk Failla, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

JARED J. SCHARF, White Plains, New York (Adam L. Scharf, White Plains, New York, Michael T. Sullivan, Riconda & Garnett, Valley Stream, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Richard Josephberg appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Charles L. Brieant, Judge, convicting him on all counts of a seventeen-count indictment, to wit: evasion of payment of personal income taxes for the years 1977-1980 and 1983-1985, in violation of 26 U.S.C. § 7201 (Count 1); conspiracy to defraud the Internal Revenue Service ("IRS") and, in violation of 18 U.S.C. § 1347, to defraud Josephberg's health care insurer, all in violation of 18 U.S.C. § 371 (Count 2); evasion of personal income taxes for the years 1997 and 1998, in violation of 26 U.S.C. § 7201 (Counts 3 and 4); subscribing false income tax returns for the years 1997 and 1998, in violation of 26 U.S.C. § 7206(1) (Counts 5 and 6); willful failure to file timely personal income tax returns for the years 1999-2002, in violation of 26 U.S.C. § 7203 (Counts 7-10); willful failure to pay income tax due for the years 1999-2003, in violation of 26 U.S.C. § 7203 (Counts 11-15); obstructing and impeding the due administration of the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a) (Count 16); and health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Count 17). Josephberg was sentenced principally to 50 months' imprisonment to be followed by a three-year period of supervised release.

On appeal, Josephberg contends (a) that his convictions on Counts 1-6, 16, and 17 should be reversed, and those counts dismissed, on the ground of insufficiency of the evidence; (b)

- 2 -

that his convictions on the remaining counts, 7-15, should be reversed and those counts dismissed on the ground that they violate his Fifth Amendment privilege against self-incrimination; (c) that as to any counts not dismissed, he is entitled to a new trial on grounds of prosecutorial misconduct and/or errors in the district court's instructions to the jury; and (d) that there were errors in the calculation of his sentence.  For the reasons that follow, we reject Josephberg's contentions.

I.  BACKGROUND

The present prosecution focused on the financial activities of Josephberg, an investment banker and investment advisor, during the period 1977-2004.  At issue principally were transactions generating losses that were not permissible tax deductions because the transactions were entered into with no profit motive and involved no market risk, and Josephberg's conduct with respect to his personal tax liabilities resulting from those transactions.  At trial, the government presented, inter alia, (a) documentary evidence such as IRS computer printouts of Josephberg's tax activity showing, e.g., the dates on which returns were filed or assessments were made or notices were sent, IRS certificates of assessments stating Josephberg's tax liability, IRS notices of deficiency, and financial records of Josephberg and his children; and (b) testimony from numerous witnesses, including Josephberg's former business partner Jeffrey

Feldman, Josephberg's former accountant Hyman Fox, former clients of Josephberg who were instructed by Josephberg to send his compensation to accounts in the names of his children rather than to Josephberg himself, and revenue agents and officers of the IRS. The evidence, taken in the light most favorable to the government, summarized here and discussed in greater detail as necessary in Part II below, showed the following.

A.  The Straddle, and Simulated Straddle, Transactions

In the late 1970s, a company owned by Josephberg and Feldman, Cralin Associates, Inc. ("Cralin"), entered into an agreement with a company owned by one Bernard Manko, pursuant to which Josephberg and his Cralin business associates would "syndicate"--i.e., sell interests in (Trial Transcript ("Tr.") 130-31)--limited partnerships that were created to invest in tax shelter "straddle" transactions involving United States Treasury bills ("T-Bills") (collectively the "Manko tax shelters" or "tax shelter partnerships").  A straddle is the simultaneous ownership of a contract to buy a commodity for delivery in a future month and a contract to sell the same amount of the same commodity in a different future month, see generally United States v. Atkins, 869 F.2d 135, 137-38 (2d Cir.) ("Atkins"), cert. denied, 493 U.S. 818 (1989).  As each Manko tax shelter partnership owned both contracts to buy and contracts to sell, either the purchase contracts or the sale contracts could be sold at a loss.  Each year the partnerships sold the category of contracts that had

- 4 -

decreased in value, thereby realizing losses. As the losses (or gains) realized by a partnership flow through to the individual partners in proportion to their respective ownership interests, see generally United States v. Helmsley, 941 F.2d 71, 84 n.5 (2d Cir. 1991), cert. denied, 502 U.S. 1091 (1992); 26 U.S.C. §§ 701-04, the individual investors in a given Manko tax shelter partnership claimed their shares of those losses as deductions on their income tax returns for that year. The partnership's sale of the offsetting profitable contracts was deferred until the following year; but tax shelter straddle transactions were repeated through 1980, with the amounts escalating each year (see Tr. 142) in order to generate losses that would offset the gains that had been rolled forward from the year before (see id. at 133-34). While an "ordinary straddle is not risk free because there is no assurance that the gain on the second leg will be equal in amount to the loss on the first leg," Atkins, 869 F.2d at 137, Josephberg and his Cralin associates sought to structure their straddles or simulated straddles in ways that would ensure that "everything washe[d] out," i.e., that "if there was a profit" it was "the same amount as [the] loss" (Tr. 154).

In 1981, the accumulated deferred gains for Josephberg, Feldman, and their tax shelter partners totaled some $140 million; absent an offsetting loss, taxes on those gains would have been owing in 1982. These gains could not be offset by further Manko tax shelters, however, because of a provision in the Economic Recovery Tax Act of 1981 requiring generally that a straddle owner

- 5 -

claiming a straddle loss must recognize the gain in the offsetting commodity contract in the same year as the claimed loss, even if the gain was as yet unrealized. See 26 U.S.C. § 1092. In order to obtain losses to offset the $140 million in gains rolled into 1981, Josephberg and his associates entered into an agreement with a government bond dealer, New York Hanseatic ("Hanseatic"), whose principal was Charles Atkins, to generate tax losses in T-bill transactions by using repurchase agreements (or "repos"), which are "devices for financing the purchase or sale of securities," Atkins, 869 F.2d at 138. T-bills are purchased at a discount and appreciate through the dates of their maturity. Repo transactions were used by Josephberg and his associates to "simulate a straddle" (Tr. 145) by deducting the financing expense in one year and realizing the gain from the T-bills' appreciation in the following year. In 1981 Cralin paid Hanseatic approximately $1 million to purchase $140 million in T-bill repo losses ("without any physical securities being involved" (id. at 151)), and the individual investors claimed their shares of those losses as deductions on their income tax returns to offset the tax-shelter-deferred gains (see id. at 150).

The Manko tax shelter straddles had been designed to create deductions amounting to four times the investor's capital contribution. (See id. at 131-32.) Both the Manko and the Hanseatic-related shelter transactions were "pre-arranged," "manipulated," "rigged," and "riskless" (e.g., id. at 150-51, 159, 168-69); and Josephberg and his partners engaged in these

transactions not for the purpose of producing profits but solely for the purpose of generating losses that investors could deduct from income on their tax returns (see id. at 142-43, 147-55). Indeed, in 1981, when Cralin entered into its first transaction with Hanseatic, Cralin could have made a profit of more than $20 million at the second planned stage of the financing process, due to an anomalous and precipitous decline in interest rates; but instead of financing the repo expense at the lower rate, Cralin chose to pay the originally planned, non-prevailing, higher interest rate in order to achieve the desired $140 million loss. (See id. at 146-50.)

Cralin continued these simulated straddle transactions until the IRS began an investigation of the transactions with Hanseatic. (See Tr. 155-56.) The last Hanseatic repo deal occurred in 1984, with losses taken in that year and the gains deferred into 1985. (See id. at 155.) Feldman, who described the Manko and Hanseatic transactions at trial, and had pleaded guilty to conspiring to commit tax fraud with respect to the purchase of $140 million in tax losses from Hanseatic in 1981 (see id. at 158, 161), testified "[w]e didn't care about profits" (id. at 196).

Among those claiming shares of the losses generated by these tax shelter transactions on their individual tax returns were Josephberg and other Cralin principals, who received syndication fees for creating and marketing the Manko partnerships. (See id. at 931-33.) Because of their roles as syndicators, the Cralin principals were not even required to make

cash investments in the Manko tax shelter partnerships in order to claim losses; Josephberg and his partners simply received "an allocation of the losses in the structure of the transaction." (Id. at 133.)

Because of the losses claimed, the tax returns of the Cralin principals for the years in question generally showed no tax liability. (See id. at 933.) In 1978, for example, Josephberg reported more than $250,000 in wages and other income on his personal income tax return; but, claiming more than $260,000 in losses attributable to the Manko-related transactions, he paid nothing in taxes. For the period 1977-1985, Josephberg earned more than $3,672,000, a significant portion of which came from his sales, through Cralin, of the Manko and Hanseatic-related tax shelters; because of the tax shelter losses he claimed, he paid a total of only $41,000 in taxes for those nine years. (See GX JD-12.)

B. The IRS Investigation and Josephberg's Re-routing of Assets

In 1986, the IRS sent Josephberg a letter indicating that it calculated he owed some $372,000 in taxes for the years 1977-1980, based on its rejection of losses generated by the Cralin tax shelter partnerships in which Josephberg participated. (See GX PW-1.) The letter informed Josephberg of his right to challenge this calculation through the IRS appeals process. Josephberg appealed these adjustments unsuccessfully, and the IRS in 1993 issued a notice of deficiency to Josephberg with respect

to this debt (see GX 152). Josephberg had also received a notice of deficiency in December 1992 stating that he had an additional tax liability of $548,592 for 1985. (See GX PW-6.) Josephberg commenced tax court actions, petitioning for redeterminations of these deficiencies. In the action challenging the calculations for 1977-1980, Josephberg failed to answer, object to, or otherwise respond to IRS requests for factual admissions; the facts set forth in those requests were deemed admitted; and the IRS motion for summary judgment against him was granted. See Josephberg v. CIR, No. 496-94 (Tax Ct. Jan. 31, 1996) ("Tax Court Judgment I"). Josephberg's action challenging the calculation of his tax deficiency for 1985 was dismissed for lack of prosecution after neither he nor anyone representing him showed up for trial. See Josephberg v. CIR, No. 4824-93 (Tax Ct. Apr. 16, 1996) ("Tax Court Judgment II").

After the entry of these tax court judgments, the IRS commenced efforts to collect Josephberg's tax debts for 1977-1980 and 1985, including accrued interest and penalties. In addition, in 1997 it issued to Josephberg notices of deficiency for the tax years 1983 and 1984, which Josephberg did not challenge. The IRS's efforts to collect Josephberg's tax debts were impeded because Josephberg repeatedly maintained, in the ensuing IRS interviews and in his representations on IRS asset disclosure forms, that he had no assets that had not already been seized by the IRS.

In fact, however, Josephberg was merely hiding his income. On his IRS asset disclosure form dated June 4, 1997, Josephberg represented that he owned only a 50 percent interest in his investment banking firm, Josephberg Grosz & Co. Inc. ("Josephberg-Grosz") (see GX 181-B), despite the fact that since 1993 he had owned 100 percent of that firm (see Tr. 967-69). In the fall of 1997, Josephberg created two new entities, JG Capital, Inc. ("JG Capital"), and JG Partners. (See GX 201-C.) JG Capital was wholly owned by JG Partners, which in turn was 99-percent-owned by Josephberg's three children, unbeknownst to them; Josephberg owned the remaining 1 percent. (See Tr. 418-19.) On his subsequent IRS asset disclosure form, Josephberg did not disclose the existence of JG Capital or JG Partners. (See, e.g., GX 181-D.) He told Fox, his accountant, that he created the two entities for the purpose of placing his investment banking income beyond the reach of the IRS, because any account in his name would undoubtedly have been levied upon. (See Tr. 976-77.)

In addition, in or around 1993 (see id. at 1060), the year in which he received the IRS notice of deficiency for 1977-1980, Josephberg had created securities accounts in the names of his children, likewise unbeknownst to them, which he alone managed (see, e.g., id. at 754-55, 772, 782-83, 788). Josephberg then, as compensation for his investment banking and other professional services, had his clients issue stock in the names of JG Capital, JG Partners, his wife, or his children. (See, e.g., id. at 328, 357-58, 698-700.) Josephberg did not disclose the existence or

contents of these accounts, or his unfettered control over them, to the IRS. (See GX JD-7, 181-B, 181-D.) For example, although Josephberg stated in a May 1997 IRS interview that he lacked the wherewithal to pay his bills and that he had not closed a deal as an investment banker in two years (see Tr. 535-37), in fact within that period Josephberg had raised capital for GK Intelligent Systems ("GK") and had caused hundreds of thousands of dollars of his fee to be paid in the form of stock and placed in the accounts of his children. Although the stock was "restricted stock," in that it could not be sold for a period of time, when the restrictions lapsed Josephberg used those assets at will.

In 1998 and 1999, for example, without the knowledge of his daughter Kara, Josephberg sold shares of GK stock that had been issued in her name as compensation for his services, and he caused the gains resulting from those sales--some $59,000 for 1998 and $30,000 for 1999--to be reported on Kara's tax returns. (See Tr. 779-81; GX 130, GX 131.) At trial, Kara testified that she had never filed her own tax returns before 2001, that she had not signed the returns showing the sales of the GK stock, and that she had not even been aware that she owned GK stock. (See Tr. 774, 782.) In 2001, Kara filed an individual tax return for the year 2000, reporting income she had received for her work as a summer associate at a law firm, and she expected a significant tax refund. Instead of receiving a refund, she learned that she had a personal tax liability of more than $10,000 resulting from

Josephberg's sales of the GK stock he had had put in her name. (See id. at 779-81.)

Josephberg also had some of his income placed in accounts in the name of his younger daughter, Jessica; and in 1998, 1999, and 2000, he sold shares of stock in her name for a total of more than $148,000. (See GX 133, GX 134, GX 135.) The parties stipulated that if Jessica were called as a witness at trial, she would testify that she had no recollection of signing or filing, and no role in preparing, tax returns; that she had never been required to file a return and had not known that in fact returns in her name were filed for the tax years 1998, 1999, and 2000-- when she was 11-13 years of age. As a result of those returns, Jessica's tax liability by the time of trial, including penalties and interest resulting from nonpayment of taxes, was some $52,600. (See Tr. 755-56.)

Josephberg told Fox that he caused stock to be issued in his children's names because "[t]he IRS had levied all of his bank accounts, [and] he had no place else to put it." (Tr. 976.) As a result, while his tax debts remained outstanding, Josephberg used the accounts of his children and the corporate accounts of JG Capital and JG Partners to pay various personal expenses, such as rent (totaling some $250,000), country club dues (totaling nearly $300,000), and parties costing tens of thousands of dollars. (See, e.g., GX JD-6; GX JD-13.)

C. **The Fraudulent 1997 and 1998 Returns, the Subsequent Failures To File Timely and To Pay, and the Health Care Fraud**

For the 20 years spanning 1979-1998, Josephberg claimed and carried forward on his individual tax returns a substantial net operating loss (or "NOL") stemming from Cralin's tax shelter activities. The IRS's 1993 notice of deficiency informed Josephberg that his claimed losses from the Cralin tax shelter transactions were disallowed because they were "not bona fide economic transactions, but rather were pre-arranged, manipulated, fixed, rigged & risk-free transactions that generated artificial tax losses" and because it had "not been shown that the partners or the partnership entered into the transactions primarily for profit." (GX 152.) Josephberg nonetheless continued to carry the NOL forward and claimed it on his returns for tax years 1993 through 1998, signing and filing those returns under penalty of perjury. (See Tr. 970-72, 988-89, 999-1000; GX 116, GX 117, GX 118, GX 119, GX 120, GX 121.) The NOL carried over was substantial. On Josephberg's 1997 return, for example, it was more than $1.5 million (see GX 120); on his 1998 return, it was more than $1.2 million (see GX 121); and on each such return, except for his Social Security self-employment tax, the NOL deduction resulted in a claimed tax liability of zero.

In addition, on his returns for 1997 and 1998, Josephberg failed to pay withholding, Social Security, and Medicare taxes (collectively "employment taxes") for Norma Grant, who resided with the Josephbergs, was nanny for their daughter Jessica, and did housekeeping chores. For the tax years 1999-2002, Josephberg

- 13 -

failed to file timely tax returns; and he made no payment of taxes for the years 1999-2003.

As to the charge of health care fraud, the record showed that in the fall of 1998, Josephberg submitted to Oxford Health Plans ("Oxford"), his health care provider, two false documents designed to induce Oxford to provide coverage for Mrs. Josephberg and to charge a group insurance rate to Josephberg's company. (See Part II.B.4. below.) The documents were false tax forms prepared by Fox, who testified that he prepared the first after Josephberg "asked me to prepare a phony Schedule C" showing Mrs. Josephberg as an employee of Josephberg-Grosz (Tr. 985). Josephberg had Fox prepare a second false tax form in response to a request from Oxford for further documentation. (See id. at 986-88.)

Prior to trial, Fox had pleaded guilty to tax fraud with respect to Josephberg's returns, to health care fraud with respect to the documents submitted to Oxford, and to conspiring with Josephberg to commit those frauds. (See id. at 922-23.)

D. The Verdicts and Sentence

The jury found Josephberg guilty on all seventeen counts of the indictment, to wit, income tax evasion for the years 1977-1980 and 1983-1985, in violation of 26 U.S.C. § 7201 (Count 1); evasion of tax assessments for the years 1997-1998, in violation of id. § 7201 (Counts 3 and 4); subscribing fraudulent tax returns for the years 1997-1998, in violation of id. § 7206(1) (Counts 5

- 14 -

and 6); willful failure to file timely tax returns and to pay taxes due for the years 1999-2002, in violation of id. § 7203 (Counts 7-14); willful failure to pay taxes for the year 2003, in violation of id. § 7203 (Count 15); attempting to obstruct the IRS's investigation into his assets, in violation of id. § 7212(a) (Count 16); and health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Count 17). It found Josephberg guilty as well of conspiring with Fox to defraud the IRS, to violate § 1347 by defrauding Oxford, to evade assessment of his tax obligations for the years 1994-1998, and to subscribe fraudulent tax returns for those years, all in violation of 18 U.S.C. § 371 (Count 2).

By the time of his trial in 2007, Josephberg's total tax debt dating back to his tax year 1977, including interest and penalties, was approximately $17,000,000. The district court calculated Josephberg's sentence under the 2006 version of the advisory Sentencing Guidelines ("Guidelines") but imposed a non-Guidelines sentence of, principally, 50 months' imprisonment. (See Part II.F. below.) This appeal followed.


II. DISCUSSION


On appeal, Josephberg contends principally (a) that the government's evidence was legally insufficient to convict him on Counts 1-6, 16, and 17, the tax evasion, tax fraud, obstruction, and health care fraud counts, and that those counts should thus be dismissed; (b) that Counts 7-15, the failure-to-file and

failure-to-pay counts, should be dismissed because they violate his Fifth Amendment privilege against self-incrimination; and (c) in the alternative, that he is entitled to a new trial on grounds of prosecutorial misconduct and/or errors in the court's jury charge. He also challenges his sentence on the grounds that the application of the 2006 Guidelines violated the Ex Post Facto Clause and that the district court miscalculated the tax loss attributable to his offenses. Finding no merit in these contentions, we affirm.

A. Standards of Review

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. See, e.g., United States v. Leonard, 529 F.3d 83, 87 (2d Cir. 2008) ("Leonard"); United States v. Morgan, 385 F.3d 196, 204 (2d Cir. 2004); United States v. Hamilton, 334 F.3d 170, 179 (2d Cir.), cert. denied, 540 U.S. 985 (2003). In reviewing such a challenge, we are required to view all of the evidence in the light most favorable to the government, see, e.g., United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) ("Eppolito"), cert. denied, 129 S. Ct. 1027 (2009); Leonard, 529 F.3d at 87, crediting every inference that could have been drawn in the government's favor, see, e.g., Eppolito, 543 F.3d at 45; Leonard, 529 F.3d at 87, and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded

guilt beyond a reasonable doubt, see, e.g., Eppolito, 543 F.3d at 45-46; United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).

The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony, see, e.g., United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980). "[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998); see, e.g., United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). "The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." United States v. Hamilton, 334 F.3d at 179; see, e.g., United States v. Roman, 870 F.2d 65, 71 (2d Cir.), cert. denied, 490 U.S. 1109 (1989). These principles apply whether the evidence being reviewed is direct or circumstantial. See, e.g., Glasser v. United States, 315 U.S. 60, 80 (1942). The conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

In contrast, we review de novo claims of legal error such as constitutional challenges to the indictment, see, e.g., United States v. Ebbers, 458 F.3d 110, 125 (2d Cir. 2006), cert. denied, 549 U.S. 1274 (2007), and alleged errors in the trial judge's

- 17 -

instructions, <u>United States v. Masotto</u>, 73 F.3d 1233, 1238 (2d Cir.), <u>cert. denied</u>, 519 U.S. 810 (1996); <u>United States v. Dove</u>, 916 F.2d 41, 45 (2d Cir. 1990). We review for abuse of discretion the district court's denial of a motion for a new trial. <u>See</u>, <u>e.g.</u>, <u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001); <u>United States v. Autuori</u>, 212 F.3d 105, 120 (2d Cir. 2000); <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992). In deciding such a motion, the district court must take care not to usurp the role of the jury, and the ultimate consideration is whether letting a guilty verdict stand would be a manifest injustice. <u>See</u>, <u>e.g.</u>, <u>United States v. Ferguson</u>, 246 F.3d at 134.

B. <u>The Sufficiency Challenges</u>

In order to prevail on a charge of income tax evasion in violation of 26 U.S.C. § 7201, the government must prove (1) the existence of a substantial tax debt, (2) willfulness of the nonpayment, and (3) an affirmative act by the defendant, performed with intent to evade or defeat the calculation or payment of the tax. <u>See</u>, <u>e.g.</u>, <u>United States v. Ellett</u>, 527 F.3d 38, 40 (2d Cir. 2008); <u>United States v. Helmsley</u>, 941 F.2d at 83-84; <u>United States v. Romano</u>, 938 F.2d 1569, 1571 (2d Cir. 1991); <u>United States v. Koskerides</u>, 877 F.2d 1129, 1137 (2d Cir. 1989). Josephberg contends principally that the government's evidence at trial was insufficient to show (1) that he had any tax debt, (2) that he made any material false statement in his returns for 1997 and 1998, and (3) that he engaged in any affirmative conduct to evade

- 18 -

payment or obstruct collection of his tax debt. For the reasons that follow, we disagree.

1. The Existence of a Substantial Tax Debt

With respect to Counts 1, 3, and 4, Josephberg contends, inter alia, that the government's evidence was legally insufficient to support a finding of substantial tax due. Josephberg conceded in the district court (see Defendant's Requests for Jury Instructions at 16), that the IRS tax assessment certificates for 1977-1985 introduced by the government, reflecting relevant information pertaining to his personal returns and the balance-due notices sent to him, constituted prima facie evidence that Josephberg had a substantial tax debt. See generally United States v. Silkman, 156 F.3d 833, 835-36 (8th Cir. 1998); id. at 836 ("The formal assessments were prima facie evidence of tax deficiencies."); United States v. Voorhies, 658 F.2d 710, 715 (9th Cir. 1981) ("A valid assessment is one method of establishing tax liability . . . ."); United States v. England, 347 F.2d 425, 430 n.10 (7th Cir. 1965) (approving jury charge that included the instruction that "an assessment is prima facie correct"). On appeal, Josephberg argues that the evidence was insufficient because he "mounted a strong challenge" to the certificates on the ground that the assessments against him were based on the disallowance of his deductions of his shares of the losses of the 139 tax shelter partnerships at issue and that the government did not introduce evidence of audits and adjustments

- 19 -

made to any of the partnerships themselves. (Josephberg brief on appeal at 61.)

This contention is meritless, amounting essentially to an argument as to the weight of the evidence, which, as discussed in Part II.A. above, is not a ground for reversal on appeal. As Josephberg's brief concedes, if IRS certificates of assessments "are challenged, then the issue is one for the jury." (Id.) Here, the evidence was ample to permit a rational juror to conclude that Josephberg had a substantial tax debt. First, the certificates of assessments themselves showed that before the end of 1996, the year in which the IRS collection efforts began, Josephberg had tax debts, including interest and penalties, of, for example, more than $1.3 million for the year 1979 and more than $1 million for the year 1980. By the end of 1997, Josephberg's tax debt, including interest and penalties, for 1985--the year into which all of the Cralin tax-shelter-deferred gains were ultimately rolled--was more than $8 million. (See GX 164-C, GX 164-D, GX 164-I.)

Second, although Josephberg argues that the government could not prove his tax deficiency on the basis of the certificates "alone" (Josephberg brief on appeal at 60), we need not address his legal premise because the government did not in fact rest its case on the certificates alone. The government also introduced the notices of deficiency sent to Josephberg informing him of the amounts due (see, e.g., GX 152, GX 153, GX 155, GX 156, GX 159); these notices included statements with respect to

specified tax shelter partnerships that "the partnership is not entitled to the claimed losses because it has not been shown that the partners or the partnership entered into the transactions primarily for profit" (e.g., GX 152 (emphasis added)).

In addition, the government introduced the tax court judgments rejecting Josephberg's challenges to the assessments for the years 1977-1980 and 1985. (See GX 400-B, GX 400-D.) Although Josephberg argues that "the Tax Court judgments against [him] were not on the merits" (Josephberg brief on appeal at 46), we disagree. The tax court actions were brought by Josephberg for redetermination of the deficiencies calculated by the IRS; he had the initial burden of showing that the IRS calculations were erroneous, see Tax Court Rule 142(a); see also 26 U.S.C. § 7491(a)(1); and he plainly failed to carry that burden. As described in Part I.B. above, in his action challenging the 1977-1980 calculations, Josephberg failed to respond--or object--to the IRS's requests for factual admissions, and the facts set forth in the IRS requests were "deemed admission[s] of the facts set forth in the request[s] for admissions," Tax Court Judgment I, at 1; see id. at 1-2. On the basis of those admissions, the tax court granted summary judgment against Josephberg--plainly a merits decision. In his action challenging the 1985 calculations, Josephberg and his attorneys failed to appear when the case was called for trial, and the action was "dismissed for lack of prosecution." Tax Court Judgment II. The Internal Revenue Code (or "Code") provides that "[i]f a petition for a redetermination

- 21 -

of a deficiency has been filed by the taxpayer, a decision of the Tax Court dismissing the proceeding <u>shall be considered as its decision that the deficiency is the amount determined by the Secretary</u>." 26 U.S.C. § 7459(d) (emphasis added). Thus, the tax court decision in Josephberg's action challenging the 1985 calculations was likewise a ruling on the merits.

In sum, despite the absence of direct proof as to the audits of the tax shelter partnerships themselves, the evidence viewed as a whole was ample to permit a rational juror to find beyond a reasonable doubt that Josephberg had a substantial tax debt.

2. <u>False Statements in the Returns for 1997 and 1998</u>

As to Counts 5 and 6, which charged Josephberg with subscribing false income tax returns for the years 1997 and 1998, Josephberg also contends that the certificates "alone" (Josephberg brief on appeal at 60) were not sufficient to establish that he made material misstatements in those returns; but he makes no arguments in support of that contention other than those he makes to challenge the sufficiency of the evidence to show that he had a substantial tax debt. We reject his contention in part for the reasons discussed in the preceding section.

In addition, we note that, as described in Part I.C. above, the record included the testimony of Fox that Josephberg's returns for 1997-1998 falsely claimed entitlement to deduct his net operating loss, based on the tax shelter partnerships, in

spite of the fact that Josephberg had been expressly informed in 1993 that that loss was not allowed. The amounts claimed were plainly material: $1,534,457 for 1997, and $1,280,222 for 1998.

### 3. Affirmative Acts of Evasion

Josephberg contends that, with respect to Count 1, the government's evidence was also insufficient to prove that he engaged in any affirmative act of evasion, arguing, in part, that the witnesses on whose testimony the government relied to prove this element "withdrew the essential points of their direct testimony upon cross-examination" (Josephberg brief on appeal at 63). This argument is doubly flawed. First, the witnesses referred to by Josephberg in making this argument are IRS Revenue Agent John Dennehy and IRS Revenue Officer Joseph Lewandoski, and for the reasons discussed in Part II.D. below, we do not agree with Josephberg's characterizations of the record. Second, as discussed in Parts II.A. above and II.D. below, it is the province of the jury as the appropriate arbiter of the truth to determine what part, if any, of a witness's testimony to credit or discredit.

Josephberg also asserts that "there was utterly no evidence to prove that Josephberg concealed assets or income" (id. at 63-64), and that the stock he caused to be issued in the names of his children lacked economic value (see id. at 64). These contentions border on the frivolous.

"An affirmative act" of evasion "includes 'any conduct, the likely effect of which would be to mislead or to conceal.'" United States v. Klausner, 80 F.3d 55, 62 (2d Cir. 1996) (quoting Spies v. United States, 317 U.S. 492, 499 (1943)). "Such conduct includes 'false statements made to Treasury representatives for the purpose of concealing unreported income.'" United States v. Klausner, 80 F.3d at 62 (quoting United States v. Beacon Brass Co., 344 U.S. 43, 45-46 (1952)); see also United States v. Winfield, 960 F.2d 970, 973 (11th Cir. 1992) ("an affirmative act constituting an evasion or attempted evasion of the tax occurs when false statements are made to the IRS after the tax was due"). Accordingly, "concealment of assets or covering up of sources of income, [and] handling of one's affairs to avoid making the records usual in transactions of the kind" are examples of conduct sufficient to create an inference of evasion. Spies, 317 U.S. at 499.

As described in Part I.B. above, after the IRS began trying to collect Josephberg's tax debt following the entry of the tax court judgments, Josephberg in mid-1997 concealed the fact that he was the sole owner of Josephberg-Grosz, stating that he owned only 50 percent. In the fall of 1997, he set up JG Capital and JG Partners in order to--as he confided to his accountant Fox--place his investment banking income in accounts not bearing his name so as to avoid having the IRS seize that income. In the asset disclosure form he subsequently submitted to the IRS, Josephberg did not disclose the existence of these two entities.

- 24 -

Further, in 1993, the year in which Josephberg received the IRS notice of deficiency with respect to the earliest years, 1977-1980, he established the stock accounts for his children into which he thereafter had his investment banking income redirected. Josephberg told Fox that he had caused the stock to be placed in his children's names because "[t]he IRS had levied all of his bank accounts, [and] he had no place else to put it." (Tr. 976.) Fox testified on cross-examination that Josephberg had not been putting such stock into his children's names prior to having serious problems with the IRS. (See id. at 1060.)

Josephberg's contention that because the stock thus issued in the names of his children was "restricted" stock it had no value, is contrary to both the law (see Part II.E.1. below) and the evidence. The jury was entitled to infer that the stock was not worthless in light of the evidence as to its market value, as well as the evidence that Josephberg was willing to accept it as payment of his investment banking fees totaling hundreds of thousands of dollars and that Josephberg later sold the stock for hundreds of thousands of dollars.

4. Evidence of Health Care Fraud

Josephberg also challenges the sufficiency of the evidence to show that he defrauded his health care insurer (Count 17). He argues that "Mrs. Josephberg testified that she worked 20 hours a week for Mr. Josephberg's business, and there was no evidence in

the trial to prove otherwise." (Josephberg brief on appeal at 64-65.) The record is to the contrary.

The evidence was that in the fall of 1998, Josephberg, seeking a group rate for health insurance and inexpensive coverage for his wife, told Fox that he needed to supply his health care insurer with "tax documents that showed his wife was an employee" (Tr. 984; see id. at 1065-66), and he "asked [Fox] to prepare a phony Schedule C" (id. at 985; see also id. at 1065-66), a schedule designed to be attached to a taxpayer's federal income tax form, Form 1040, to show his income from a business. Fox, though "know[ing] it was wrong to do that," immediately complied; he "took the Schedule C and . . . added . . . a $12,000 salary to [Josephberg's] wife." (Id. at 985.) This document was submitted to Oxford by Josephberg, bearing Fox's handwritten statement that "[t]his form was included in Richard Josephbergs [sic] 1997 Form 1040" (GX 201-A; see Tr. 984-86). Fox testified that that handwritten statement "was a lie" (id. at 986): In fact Josephberg had not yet filed his 1997 tax return; and when he did eventually file a 1997 return (in 1999), the accompanying Schedule C bore no indication that Mrs. Josephberg was employed by Josephberg's company (see GX 120).

Further, when Oxford asked Josephberg for verification in the form of a New York State tax return for Mrs. Josephberg to show that she reported salary from Josephberg-Grosz, Fox prepared a New York State tax form representing that Mrs. Josephberg was employed by Josephberg-Grosz in 1997, which Josephberg then sent

- 26 -

to Oxford. (See Tr. 986-88; GX 201-B.) This form too was false. (See Tr. 987.)

Mrs. Josephberg herself testified at trial that she had not received any salary from Josephberg's company. (See Tr. 1882.) Indeed, the government introduced evidence that in 1997 Mrs. Josephberg commenced a personal bankruptcy proceeding in which she, inter alia, said she was employed solely as a teacher by Westchester County, and that she stated under oath that she "'ha[d] no knowledge of Richard Josephberg's business operations'" (Tr. 1881 (quoting Mrs. Josephberg's response to Interrogatory 5 in her bankruptcy proceeding)). Asked at trial if she had given that answer, Mrs. Josephberg responded "that's true, I really didn't know about his business operations." (Id. at 1882.)

The evidence that Josephberg had Fox prepare false documents to indicate that his wife worked at his firm was itself sufficient to permit an inference that she did not in fact work there. And that inference was amply supported by Mrs. Josephberg's sworn statements that she lacked any knowledge of Josephberg's business operations.

5. Other Sufficiency Challenges

Although Josephberg's brief also lists Count 2 (conspiracy) and Count 16 (obstruction) in the heading of the section challenging the sufficiency of the evidence, the ensuing discussion contains no argument with respect to those counts. To the extent that Josephberg means to imply that his convictions on

- 27 -

those counts are flawed because of the insufficiencies he asserts with respect to other counts, any such contention founders on our rejection of his sufficiency challenges to those other counts. Any other sufficiency challenges to Counts 2 and 16 are waived.

C.    The Fifth Amendment Challenge to Counts 7-15

Josephberg contends here, as he did in the district court, that Counts 7-15 of the indictment, charging him with willful failure to file timely income tax returns for the years 1999-2002 and willful failure to pay tax for the years 1999-2003, must be dismissed as violative of his Fifth Amendment privilege against self-incrimination. He argues principally that because in those years there was an ongoing investigation into the propriety of his continued claims of net operating loss, the very filing of returns for those years would tend to incriminate him, for if he continued to claim the loss he would subject himself to prosecution for those years as well, whereas if he did not claim the loss it would be tantamount to an admission that his prior NOL claims were impermissible. The district court properly rejected this argument, based on long-standing Supreme Court precedent.

It is well settled that the Fifth Amendment does not provide a blanket defense for a failure to file tax returns. See California v. Byers, 402 U.S. 424, 434 (1971); United States v. Sullivan, 274 U.S. 259, 263-64 (1927). Although a taxpayer may, on his return, invoke his Fifth Amendment privilege selectively as to any particular item of information solicited, see, e.g., id. at

- 28 -

264; United States v. Barnes, 604 F.2d 121, 148 (2d Cir. 1979) cert. denied, 446 U.S. 907 (1980), "[t]here is no constitutional right to refuse to file an income tax return," Byers, 402 U.S. at 434. This principle has been applied even where there is an ongoing investigation into the taxpayer's affairs. See, e.g., United States v. Poschwatta, 829 F.2d 1477, 1482 & n.3 (9th Cir. 1987) ("[e]ven assuming" that the IRS was known to be conducting an ongoing criminal investigation, "defendant was required to file his returns" (citing Sullivan)), cert. denied, 484 U.S. 1064 (1988), effectively overruled on other grounds by Cheek v. United States, 498 U.S. 192 (1991), as noted in United States v. Powell, 936 F.2d 1056, 1064 n.3 (9th Cir. 1991); United States v. Malquist, 791 F.2d 1399, 1401-02 (9th Cir.) (failure to file a "tax return" within the meaning of § 7203 is not excused by Fifth Amendment concerns over a pending investigation (citing Sullivan)), cert. denied, 479 U.S. 954 (1986).

Although Josephberg contends that this Court in United States v. Romano, 938 F.2d 1569 ("Romano"), ruled that the Fifth Amendment provides protection against a willful-failure-to-file charge where there is an ongoing investigation into the taxpayer's affairs, that contention is squarely contradicted by Romano itself. The case involved a defendant who in November 1983 attempted to transport $359,500 in cash from the United States into Canada. The cash was seized and held by United States customs officials, and the IRS immediately served Romano with a "termination assessment" of $169,973 as income tax due, an

assessment that causes the resulting tax to be due immediately. Romano, 938 F.2d at 1570. On the following day, the IRS filed a lien to secure payment of the assessed tax. Thereafter the government sought forfeiture of the entire $359,500. While the forfeiture proceeding was pending, the government commenced a criminal prosecution against Romano alleging various tax violations; ultimately, all but a charge of tax evasion were dismissed on consent; and after a bench trial on stipulated facts, Romano was convicted of that offense.

On appeal, we held that the evidence was insufficient to prove the affirmative-act element of tax evasion, despite several theories advanced by the government. One of the theories we rejected was that Romano's failure to file a tax return in April 1984--some five months after the border incident, the seizure of the cash, and the IRS's filing of its lien--constituted an attempt to evade taxes. Although Josephberg states that "[t]his Court reversed Romano's conviction, holding that by filing a tax return Romano might have revealed the source of the currency and incriminated himself, in violation of his Fifth Amendment privilege" (Josephberg brief on appeal at 77), the Romano opinion itself, far from supporting this imputation of a Fifth Amendment rationale for the reversal, expressly noted that Romano was not excused from filing the return. The offense of which Romano was convicted was tax evasion, not failure to file. This Court rejected the government's failure-to-file theory of evasion simply because (1) a mere willful omission is not an affirmative act, see

Romano, 938 F.2d at 1573, and (2) Romano's failure to file could not logically be viewed as an act of evasion or attempted evasion because, as Romano was well aware, before the tax return was due the government already knew of the money and, indeed, had custody of it, see id. at 1573-74. Notwithstanding the fact that the tax return could have called for incriminating information as to the source of the money, we stated that "Romano was, of course, required to file a tax return," id. at 1574; see also id. at 1570-71 ("The filing of a termination assessment does not relieve the taxpayer of her obligation to prepare, sign, and file a true and correct income tax return for that year."). Citing Sullivan, 274 U.S. 259, we reasoned that the mere requirement that the tax return be filed did not infringe Romano's Fifth Amendment privilege because "Romano need only have filed a return reporting this money as 'Sullivan case income--$395,500'." Id. at 1573.

> [W]hatever Romano's specific reasons may have been for not filing the 1983 return, an attempt to evade taxes was not one of them, for there was nothing for Romano to gain, nothing to conceal from the IRS, except possibly some incriminating information as to the source of the income--information that is protected by the fifth amendment.
>
> Romano was, of course, required to file a tax return, and his failure to do so might have been a basis for the lesser criminal charge of failure to file, see 26 U.S.C. § 7203, one of the charges that was dropped. However, given that Romano was required to provide only the bare minimum of information under Sullivan, to protect his fifth amendment rights, information which the government already had and which Romano knew the government had, we cannot accept the government's claim that Romano's failure to file under these circumstances has probative weight in establishing the more serious crime of tax evasion.

- 31 -

Romano, 938 F.2d at 1574 (first emphasis in original; subsequent emphases ours).

We agree with the reasoning adopted in Romano. The pendency of a government investigation does not give a taxpayer a Fifth Amendment option to fail to file his tax return. His privilege against self-incrimination is protected by his right to refuse, with a Sullivan citation, to answer the questions that implicate that privilege. The district court correctly denied Josephberg's motion to dismiss Counts 7-15.

D. Allegations of Prosecutorial Misconduct

Josephberg contends that as to any counts against him that are not dismissed, he is entitled to a new trial on the grounds that the government made "knowing use of false testimony" (Josephberg brief on appeal at 68), made "efforts to elicit false and misleading testimony" from certain witnesses (id. at 72), and made "improper prejudicial remarks in summation" (id. at 68). We are unpersuaded.

In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that "(i) the witness actually committed perjury . . .; (ii) the alleged perjury was material . . .; (iii) the government knew or should have known of the perjury at [the] time of trial . . . ; and (iv) the perjured testimony remained undisclosed during trial . . . ." United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000) (internal quotation marks omitted), cert. denied, 531 U.S. 1143

(2001).  Differences in recollection do not constitute perjury, see, e.g., United States v. Sanchez, 969 F.2d 1409, 1415 (2d Cir. 1992), and when testimonial inconsistencies are revealed on cross-examination, the "jury [i]s entitled to weigh the evidence and decide the credibility issues for itself," United States v. McCarthy, 271 F.3d 387, 399 (2d Cir. 2001), abrogated on other grounds by Eberhart v. United States, 546 U.S. 12 (2005); see also United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000) ("[C]ross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony.").  It is the task of the jury as the "appropriate arbiter of the truth" to "sift[] falsehoods from facts" and determine whether an inconsistency in a witness's testimony represents intentionally false testimony or instead has innocent provenance such as confusion, mistake, or faulty memory.  United States v. Zichettello, 208 F.3d at 102 (internal quotation marks omitted); see, e.g., United States v. Blair, 958 F.2d 26, 29 (2d Cir. 1992).

Josephberg's arguments fall far short of meeting the criteria for showing perjury.  His principal allegations of perjury focus on the testimony of IRS Revenue Agent Dennehy.  In the background section of his brief, Josephberg asserts that

> Dennehy attempted to bolster his reliance on the [assessment certificates] by testifying (for a time) that he "verified" ([Tr. 1528]) and he "reviewed" ([Tr. 1614]) the audit reports (RARs) showing the audit adjustments for the 139 partnerships and that he had spoken with the revenue agents who had performed the partnership audits and written the RARs in the 1980s.  ([Tr. 1637].)

> Dennehy's testimony that he reviewed and verified <u>the partnership RARs</u> and spoke[] to the agents was false. . . .

>         . . . .

>        . . . Dennehy's claims <u>that he had verified and reviewed the RARs for the 139 partnerships</u> on Josephberg's tax returns were proven false.

(Josephberg brief on appeal at 15, 19 (emphases added).)

The trial transcript, however, demonstrates that these are mischaracterizations of Dennehy's testimony. First, there were two groups of RARs, <u>i.e.</u>, revenue agent reports: one for Josephberg's individual tax returns, and the other for the tax shelter partnership returns. At the transcript page cited by Josephberg for the proposition that Dennehy testified "I verified the RARs" (Tr. 1528), Dennehy was being cross-examined about the top line of a chart he had prepared, which was in evidence as GX JD-2, of Josephberg's taxable income for the years 1983-1989 as corrected for the disallowance of Josephberg's net operating loss carryovers; the RARs that Dennehy testified he had used to prepare this chart were the RARs for Josephberg's individual returns, not for the returns of the partnerships. (See <u>id.</u> at 1523-28; <u>see also id.</u> at 1593-94 (in discussing "the RARs [that] were the basis for adjusting the top line," defense counsel asked, "[t]hese RARs that you're referring to, these are the revenue agent reports prepared by the revenue agents who [audited] Richard Josephberg's tax returns?" Dennehy responded "Yes."); <u>id.</u> at 1613 (again discussing GX JD-2: "Q. Now these revenue agent reports that you relied on, they're all in regard to audits of Richard Josephberg's

1040s? A. Well, yes, and there were additional revenue agent reports with regard to the partnerships. Q. But you relied on the ones regarding the 1040s, correct? A. Correct.").)

Second, at the transcript page cited by Josephberg for the proposition that Dennehy testified "that he had verified and reviewed the RARs <u>for the 139 partnerships</u>" (Josephberg brief on appeal at 19 (emphasis added); <u>see also</u> <u>id</u>. at 15), Dennehy testified as follows:

> "Q. Did you review the RARs concerning the partnerships?
>
> A. Yes, I think I indicated that. <u>I looked at some</u> of those RARs.

(Tr. 1614 (emphasis added).) Defense counsel plainly understood Dennehy to mean he had looked at only some, not all 139. He asked: "<u>So which of the partnership RARs</u> that are listed on Richard Josephberg's Schedules E for those nine years <u>did you read</u>?" (<u>Id</u>. at 1636 (emphases added).)

Nor did Dennehy testify that he had spoken with all of the revenue agents who had prepared those partnership RARs. Rather, he testified that he "did locate one who was working on one of the Cralin partnerships" (<u>id</u>. at 1611; <u>see also</u> <u>id</u>. at 1742 ("when I became aware of the partnership aspect of the case, I made contact with whoever and wherever I could"; "I found one particular agent who I thought may be of some help")).

In the perjury section of his brief, Josephberg's only argument with respect to Dennehy is that

> Dennehy was an integral part of the prosecution since 2002. He claimed that he did not review the 139 RARs

until October 2006, after the court ordered that all partnership audit records be provided to the defense. Thus, Mr. Okula [an assistant United States Attorney] knew that the government did not even possess the RARs Dennehy claimed he reviewed.

(Josephberg brief on appeal at 70-71.) On its face, the logic of this assertion, even if it were accurate in its details, is hardly clear; and as an allegation of perjury, it is incomprehensible.

Josephberg also points to varying statements in the testimony of IRS Revenue Officer Lewandoski:

Lewandoski testified on direct examination that Josephberg told him on May 28, 1997, that he has "no deals going," and "no income coming in at the time." ([Tr. 534, 539, 542-43, 553, 562, 566-67].)

However, on cross-examination, Lewandoski admitted that Josephberg actually had told him on May 28, 1997 that he had six deals pending at the time. ([Tr. 583-84].) Lewandoski then amended his testimony and said that Josephberg had told him in December 1996 that he had no deals pending. ([Tr. 584-85].) But then Lewandoski amended that testimony and admitted that Josephberg had not told him in December 1996 that he had no deals pending. ([Tr. 585].) In the end, it was clear to Lewandoski that Josephberg informed him on May 28, 1997 that he had six deals pending. ([Tr. 585-87].)

(Josephberg brief on appeal at 12.) But Lewandoski's testimony that Josephberg said he had no pending deals and no income, which appears on only two of the eight pages cited by Josephberg (i.e., Tr. 534 and 567), and which obviously was thoroughly explored on cross-examination, was not shown to be false. Testifying a decade after his dealings with Josephberg, Lewandoski refreshed his recollection by reviewing his notes of his various conversations with Josephberg; he testified that an entry in his May 28th notes "show[ed] that [Josephberg] said that he has no deals imminent,"

and that another entry showed that Josephberg "did say later in the interview" that he was working on "six deals" (id. at 586). Thus, while Lewandoski acknowledged that on May 28, 1997, Josephberg had said he had six deals pending, his testimony that Josephberg had also said he had "no deals imminent" (id. at 534, 586) was not shown to be untrue.

In essence, Josephberg's attacks on the testimony of Dennehy, Lewandoski, and other witnesses amount only to arguments that the testimony unfavorable to Josephberg should not have been credited. As discussed in Parts II.A. and II.B. above, however, witness credibility and the weight of the evidence were matters for argument to the jury; they are not bases for reversal on appeal; and the evidence was legally sufficient to support the jury's verdicts.

Josephberg's further suggestions that the government may have denied him a fair trial by coercing favorable testimony from witnesses, such as Grant by threatening deportation, or Fox by threatening a perjury prosecution if his trial testimony were inconsistent with his prior plea allocution, were rejected by the district court:

> There is no evidence in the trial record which could support a finding that Norma Grant was coerced in any way by the Government or that her testimony was altered. If efforts were made to do so, such efforts were ineffectual. The same is true with respect to Jeffrey Feldman.

District Court Memorandum and Order dated May 30, 2007, at 4. Our review of the record persuades us that there was no error in that decision.

- 37 -

Finally, Josephberg's contention that the government made prejudicially improper remarks in summation was likewise rejected by the district court, stating in part as follows:

> [I]t is noteworthy that the defense did not object contemporaneously with respect to the rebuttal summation and made no . . . request [for surrebuttal]. The rebuttal was in fact somewhat lengthy and tedious. However, the propriety of the Government's conduct has to be measured in relation to the closing arguments asserted by the defense. The defense tendered a free-ranging diatribe taking two and three-quarters hours, not counting interruptions for recesses. Much of the closing argument was not directed to the charges themselves nor was there much concession to common sense. Defendant argued, among other things, that the Internal Revenue Service was "arrogant," which it probably is, and that because of this, Defendant should be acquitted. This Court with great self-restraint refrained from interrupting and telling the jury that "if you think the Government is arrogant, write your Congressman, and if you think the Defendant is guilty beyond a reasonable doubt, enter a judgment of conviction." See United States v. Cheung, 555 F.2d 1069, 1073-74 (2d Cir. 1977).

>      . . . .

> This Court is convinced that the trial viewed as a whole was a fair trial directed towards the merits, and that at least with respect to most of the counts of conviction, the proof of guilt was overwhelming. To the extent some of the prosecutor's comments may in hindsight be regarded as somewhat in excess, they did not distort the trial, and constituted at most harmless error, which may not be a basis for relief, particularly in the absence of a contemporaneous objection. See United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002). The comment presently being criticized concerning the effect of Feldman's plea and his later motion to withdraw the plea, was a fair response to a defense argument. The jury was clearly told by this Court that guilt is personal and a plea of guilty by a Josephberg accomplice is not evidence of Josephberg's guilt.

> The argument that the defense had a chance to investigate prior wrongdoing by Hyman Fox was a fair response to defense's claims that Fox's testimony was

incredible in that he claimed Josephberg was the only person he knowingly aided in preparing false tax returns. The argument that Josephberg took no legal action against [the attorney who had represented him in the tax court actions] is inaccurate but in this Court's opinion was, at most, harmless error. It was reasonable for the Government to argue that there were many other lawyers available in New York City to litigate the civil side of the issues which Josephberg had with the Tax Court and the Treasury. The Court finds no error in the Government's rebuttal argument which would justify granting a new trial or any other relief to Defendant.

District Court Memorandum and Order dated May 30, 2007, at 2-3.

We see no error in these rulings.

E. Challenges to the Jury Instructions

Josephberg also contends that he should be given a new trial because of the district court's refusal to give jury instructions he requested as to the proper valuation of restricted stock, the employment status of Grant, and the permissible inferences from IRS certificates of assessments. We find no basis for reversal, and only the last of these causes us any concern.

1. Valuation of Restricted Stock

Josephberg asked the district court to instruct the jury that market value is an inappropriate indication of the value of restricted stock, and that the jury could find that because the stock he caused his clients to place in the accounts of his children was restricted stock, it had no value. His theory was that if that stock had no value or only nominal value, it could

not be considered concealed "assets." (Josephberg brief on appeal at 51-52.)

The court properly refused to give the requested instruction. The Internal Revenue Code provides that "[i]f, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, . . . the fair market value" of the property transferred is to be "determined without regard to any restriction other than a restriction which by its terms will never lapse . . . ." 26 U.S.C. § 83(a). Thus, although "[t]he actual value of the stock arguably may be less than the value of stock readily transferable on the open market because of restrictions imposed . . . these restrictions, other than permanent, nonlapsing restrictions, may not be considered in determining fair market value." Sakol v. CIR, 574 F.2d 694, 696 (2d Cir.), cert. denied, 439 U.S. 859 (1978) (emphases added).

The restrictions on the stock that Josephberg caused to be issued to his children were not permanent. And when they lapsed, Josephberg sold the stock. The instruction he requested would have been contrary to law.

2. "Statutory Nonemployees"

Contending that he believed that Grant was not his employee, but rather was an independent contractor for whom an employer is not required to pay employment taxes, Josephberg asked the district court to read to the jury an excerpt from an IRS

- 40 -

publication stating, *inter alia*, that "individuals who furnish personal attendance, companionship, or household care services to children" and who are not employees of a placement service "are generally treated as self-employed for all federal tax purposes," I.R.S. Publication 15-A, Employer's Supplemental Tax Guide ("Pub. 15-A" or "IRS Pub. 15-A"), at 5. Josephberg argued that even if this excerpt did not represent the law governing the relationship between the individual who furnishes services and the family using her services, it should be included in the instructions because Josephberg's reliance on the publication's language would show that his nonpayment of employment taxes for Grant was not willful. (*See* Tr. 2376.) The district court properly refused to give the requested instruction.

IRS publications, though "aimed at explaining existing tax law to taxpayers," do not have the force of law. *Taylor v. United States*, 57 Fed. Cl. 264, 266 (2003). "The authoritative sources of Federal tax law are the statutes, regulations, and judicial decisions; they do not include informal IRS publications." *Miller v. CIR*, 114 T.C. 184, 195 (U.S. Tax Ct. 2000).

The Code itself defines "employee" to include "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d). IRS regulations provide detailed guidance for determining whether a person providing services to an individual is an employee of that individual rather than an independent contractor, *see* 26 C.F.R. § 31.3121(d)-1 ("Who

are employees"); id. § 31.3121(d)-2 ("Who are employers"), and official IRS interpretations set out 20 factors to be considered in making that determination, see IRS Rev. Rul. 87-41; 26 C.F.R. §§ 31.3306(i)-1, 31.3401(c)-1.

The paragraph of Pub. 15-A invoked by Josephberg, which is titled "Companion sitters," appears in a section of that publication entitled "Statutory Nonemployees" and is drawn from 26 U.S.C. § 3506(a), a section that simply describes the circumstances under which an employment agency, conducting the business of putting sitters in touch with individuals who wish to employ them, is not to be considered the sitter's employer. The regulations interpreting § 3506 of the Code, after paraphrasing the terms of § 3506(a), see 26 C.F.R. § 31.3506-1(b), and defining "sitters" and "companion sitting placement service," see 26 C.F.R. §§ 31.3506-1(a)(2) and (a)(1), state that

> [a]ny individual who, by reason of this section, is deemed not to be the employee of a companion sitting placement service shall be deemed to be self-employed _for purposes of the tax on self-employment income_,

26 C.F.R. § 31.3506-1(c) (emphasis added), and that

> [t]he rules of this section operate only to _remove sitters and_ companion sitting placement _services_ from the employee-employer relationship when, under §§ 31.3121(d)-1 and 31.3121(d)-2, _that_ relationship would otherwise exist. . . . _[I]f, under §§ 31.3121(d)-1 and 31.3121(d)-2, a sitter is considered to be the employee of the individual for whom the sitting is performed_ rather than the employee of the companion sitting placement service, _this section has no effect upon that employee-employer relationship_.

26 C.F.R. § 31.3506-1(d) (emphases added). Thus, the statement in IRS Pub. 15-A that a sitter who is not an employee of the agency

- 42 -

is "generally treated as _self_-employed for _all_ federal tax purposes," IRS Pub. 15-A, at 5 (emphases added), could not reasonably be taken at face value.

The district court here properly instructed the jury that as to "the willfulness element of the offense of tax evasion under Section 7201 and subscribing a materially false return, Section 7206(1),"

> [b]efore you may conclude beyond a reasonable doubt that Mr. Josephberg owed employment taxes for Ms. Grant . . . you must be convinced beyond a reasonable doubt that Mr. Josephberg was aware that Norma Grant was his employee, as the law defines that term, as opposed to being an independent contractor for whom such tax payments are not required.

(Tr. 2330.)  The court added:

> You may not conclude that he knowingly and willfully failed to pay employment taxes unless the government proves to your satisfaction beyond a reasonable doubt that he knowingly and willfully acted in violation of the law as opposed to relying on a good-faith belief that Miss Grant was an independent contractor.

(_Id._ at 2331.)  The district court then described for the jury each of the 20 factors set out in the pertinent IRS Revenue Ruling, Rev. Rul. 87-41 (_see_ Tr. 2331-37).  The court properly refused to add the overly broad Pub. 15-A language, which would have been confusing and erroneous.


3.  Permissible Inferences from the Assessments

Finally, Josephberg asked the district court to instruct the jury that an IRS certificate of assessments "is only _prima facie_ proof of a deficiency and is not conclusive proof, or proof beyond a reasonable doubt, in a criminal trial that taxes were in

- 43 -

fact owing." (Defendant's Requests for Jury Instructions at 16.) After the court gave instructions that included the statement "that assessments by the IRS constitute prima facie--that's a Latin word which means [']on its face[']--constitute sufficient evidence of the asserted tax deficiencies" (Tr. 2318), Josephberg asked the court to amend its instruction and tell the jury "that the assessments may be prima facie evidence, may constitute" (id. at 2379 (emphases added)). The district court declined, and Josephberg contends on appeal that this was error. Quoting only the phrase "constitute sufficient evidence" from the instruction, he argues that the charge as given "amount[ed] to an improper conclusive presumption that took away from the jury the ability to determine on its own whether the government proved the requisite element of a substantial additional tax." (Josephberg brief on appeal at 65.) We disagree.

In determining whether the district court properly instructed the jury, we must not judge any instruction in isolation but must instead view the charge as a whole. See, e.g., Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); United States v. Carr, 880 F.2d 1550, 1555 (2d Cir. 1989). Thus, we will not make our determination "on the basis of excerpts taken out of context." United States v. Zvi, 168 F.3d 49, 58 (2d Cir.) (internal quotation marks omitted), cert. denied, 528 U.S. 872 (1999). Here, although we question the wisdom of instructing a jury in terms of procedure-driving concepts such as the prima facie case,

we see no error in the court's instructions as a whole or in its rejection of Josephberg's requested modifying language.

Our concern for the inclusion of reference to "prima facie evidence" in a jury charge is that it may tend to confuse rather than enlighten the jury. See, e.g., L. Sand et al., Modern Federal Jury Instructions--Criminal ¶ 32.01, Comment (rev. Nov. 2008) (even where the relevant statute specifies what constitutes "prima facie evidence," instructions to the jury using the term "prima facie" may be "'needlessly confusing'" (quoting United States v. Martorano, 557 F.2d 1, 7 (1st Cir. 1977))). That a prima facie case was established, in this context, means, in theory, simply that the government presented enough evidence to have the case submitted to the jury. In practice, of course, the judge may, in the interests of justice, submit the case to the jury even if he believes that a prima facie case was not established, planning to enter a judgment of acquittal if the jury returns a verdict of guilty and preserving the sufficiency issue for appeal. See generally United States v. Martin Linen Supply Co., 430 U.S. 564 (1977) (Double Jeopardy Clause of the Constitution protects a defendant against an appeal by the government from a judgment of acquittal entered prior to a jury verdict). But in instructing the jury on the law, in preparation for submitting the case to it, the trial court has no need to tell the jury that there is sufficient evidence for the case to be submitted to the jury. The risk is that the jury may be confused

- 45 -

by the announcement of such a self-evident proposition and believe that it has some other meaning.

Further, we reject Josephberg's contention that the court should have instructed only that the IRS tax assessments "may" be "prima facie" evidence of Josephberg's tax debts. As a matter of law, given a defendant's right to a jury trial, the assessments could not be conclusive, see, e.g., United States v. Silkman, 156 F.3d at 835-36; see generally Martin Linen Supply Co., 430 U.S. at 572-73 ("a trial judge is prohibited from entering a judgment of conviction or directing a jury to come forward with such a verdict, . . . regardless of how overwhelmingly the evidence may point in that direction"); but the assessments were, as a matter of law, see Part II.B.1. above, prima facie evidence of those debts. The equivocal language suggested by Josephberg could only have served to confuse.

Finally, we reject Josephberg's contention that the phrase "constituted sufficient evidence" created a "conclusive presumption" (Josephberg brief on appeal at 65) that the government had proven that Josephberg had a substantial tax debt. The challenged snippet was part of the following instruction:

> You are instructed that assessments by the IRS constitute prima facie--that's a Latin word which means on its face--constitute sufficient evidence of the asserted tax deficiencies. You may, however, consider whether there is evidence from which it can be concluded that the IRS improperly or incorrectly assessed the taxes in determining whether Mr. Richard Josephberg owed additional taxes for any of those years. And you must consider all the evidence in the case and consider and decide whether the government has proved beyond a reasonable doubt that Mr.

- 46 -

> Josephberg owed substantial additional income tax for the tax year or years that you're then considering.
>
> As I mentioned earlier, the government does not have to prove the precise amount owed so long as it proves beyond a reasonable doubt that it is substantial for the count of the indictment you are then considering.
>
> It is for you to decide whether a substantial tax deficiency exists for the years in issue, and in making that decision, you should consider all the evidence in the case.

(Tr. 2318-19 (emphases added); see also id. at 2320 ("You should decide, based on all relevant factors, whether the tax owed, if any, was substantial or merely trivial.").) Plainly, the court did not indicate that the assessments were conclusive.

F.   Challenges to the Sentence

In sentencing Josephberg, the district court began by calculating the range of imprisonment recommended by the 2006 version of the advisory Guidelines--the version then in effect--focusing particularly on Josephberg's tax offenses, the loss from which dwarfed that caused by his health care fraud. Section 2T1.1(c)(1) of that version provided, in pertinent part, that

> [i]f the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed).

Guidelines § 2T1.1(c)(1). The commentary to this section provided that

> tax loss does not include interest or penalties, except in willful evasion of payment cases under 26

- 47 -

U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203.

Id. Application Note 1 (emphasis added). Applying this guideline, which had been amended in 2001 by the addition of the "except" clause to Application Note 1, the district court found that the aggregate tax loss resulting from Josephberg's offenses, including interest and penalties, exceeded $7 million but not $20 million, making his base offense level 26, see Guidelines § 2T4.1(K). Finding, ultimately, that Josephberg's total offense level was 26 and his criminal history category was I, the court concluded that the advisory-Guidelines recommended range of imprisonment was 63-78 months. After considering the sentencing factors set out in 18 U.S.C. § 3553(a), the court elected to impose a non-Guidelines sentence of, principally, 50 months' imprisonment. (See Sentencing Transcript, September 5, 2007 ("S.Tr."), at 46-48.) We review Josephberg's sentence for abuse of discretion, see, e.g., Gall v. United States, 128 S. Ct. 586, 600-02 (2007), i.e., for an error of law, or clearly erroneous findings of fact, or a decision that cannot be located within the range of permissible decisions, see, e.g., United States v. Williams, 475 F.3d 468, 474 (2d Cir. 2007), cert. denied, 128 S. Ct. 881 (2008); United States v. Brady, 417 F.3d 326, 332-33 (2d Cir. 2005).

Josephberg makes two challenges to the court's Guidelines calculations. First, arguing that his tax evasion offenses were completed by mid-December 1998 (when he made disclosures in his wife's bankruptcy proceeding), Josephberg contends that calculations under the 2006 version of the Guidelines violated the

*Ex Post Facto* Clause because they included § 2T1.1(c)(1) as amended in 2001. Prior to that amendment, the Guidelines provided, without exceptions, that "[t]he tax loss does not include interest or penalties," Sentencing Guidelines § 2T1.1, Application Note 1 (2000). Second, Josephberg contends that in determining the loss resulting from his tax offenses, the district court erred in using the amount of taxes, interest, and penalties that were assessed and unpaid, instead of the value of the assets he concealed. These contentions need not detain us long.

"Generally, a sentencing court must use the version of the [G]uidelines in effect at the time of defendant's sentencing, not that extant at the time of the offense" unless use of the later version would create an *ex post facto* problem. *United States v. Keller*, 58 F.3d 884, 889 (2d Cir. 1995). The *ex post facto* prohibition is concerned in part with "lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Miller v. Florida*, 482 U.S. 423, 430 (1987) (internal quotation marks omitted). A crime is consummated when it is completed, and as to a continuing offense that was begun prior to the effective date of a Guidelines amendment and completed after that date, application of the amendment does not violate the *Ex Post Facto* Clause. *See*, *e.g.*, *United States v. McCall*, 915 F.2d 811, 816 (2d Cir. 1990).

In the present case, Josephberg was convicted of, *inter alia*, tax evasion for the years 1977-1980, 1983-1985, and 1997-

- 49 -

1998, in violation of § 7201, and of willful failure to file timely tax returns for the years 1999-2002, in violation of § 7203. The district court rejected Josephberg's contention that application of the 2006 version of the Guidelines would violate the Ex Post Facto Clause on his theory that "nothing was concealed after December 16th, 1998" (S.Tr. 38). The court responded: "I don't think that's a correct analysis of it. I think the issue is whether there is a continuing offense which straddled the dates of the guidelines. That's the argument, and I think you have an uphill road." (Id.) The court ultimately concluded that although some of Josephberg's acts occurred before the effective date of the 2001 amendment to § 2T1.1(c)(1), "all" of Josephberg's acts "are part of the general single offense behavior." (S.Tr. 40.)

We see no abuse of discretion in this decision. Josephberg's evasions for the years 1977-1980 and 1983-1985 gave rise to a substantial tax debt, the payment of which he attempted to avoid by claiming, on his returns through 1998, a net operating loss that he knew as early as 1993 was disallowed. The correctness of the district court's view of the relatedness of Josephberg's tax offense behavior is most clearly shown by the fact that after 1998 Josephberg elected not to file timely income tax returns for the years 1999-2002 because in part--according to his own arguments, see Part II.C. above--he was attempting to avoid taking a stance on returns for 1999-2002 that would assist in prosecuting him for having claimed net operating losses through 1998. We thus agree with the district court that Josephberg's

- 50 -

later tax offenses were closely related to the earlier offenses and were properly viewed as part of the same scheme or plan.

Finally, here, as in the district court, Josephberg contends that the district court should have ruled that the losses attributable to his tax offenses were limited to the value of the assets he concealed. Such a view is contrary to the Guidelines, which, as to an offense involving tax evasion or the filing of a false or fraudulent return, state that "the tax loss is the total amount of loss that was the object of the offense," Guidelines § 2T1.1(c)(1). The district court thus concluded, "what's being evaded is what's owed." (S.Tr. 41.) We see no abuse of discretion in this conclusion.

## CONCLUSION

We have considered all of Josephberg's arguments in support of his appeal and have found them to be without merit. The judgment of the district court is affirmed.