07-5222-cr(L),
07-5670-cr
USA v. Ware

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Submitted: April 22, 2009       Decided: August 18, 2009)

Docket Nos. 07-5222-cr(L), 07-5670-cr

_____

UNITED STATES OF AMERICA,

Appellee-Cross-Appellant,

- v. -

ULYSSES THOMAS WARE, also known as Thomas Ware,

Defendant-Appellant-
Cross-Appellee.

_____

Before: KEARSE, SACK, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, William H. Pauley III, Judge, convicting defendant of securities fraud and conspiracy to commit securities fraud and wire fraud, see 15 U.S.C. § 78j(b) and 18 U.S.C. § 2; 18 U.S.C. § 371.

Conviction affirmed; matter remanded for additional proceedings in connection with sentencing.

> MICHAEL J. GARCIA, United States Attorney for the Southern District of New York, New York, New York (Nicholas S. Goldin, Andrew L. Fish, Assistant United States Attorneys, New York, New York, of counsel), for Appellee.
>
> ULYSSES THOMAS WARE, Brooklyn, New York, Defendant-Appellant pro se.

KEARSE, Circuit Judge:

Defendant pro se Ulysses Thomas Ware appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before William H. Pauley III, Judge, convicting him of securities fraud, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), and 18 U.S.C. § 2; and conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371. Ware was sentenced principally to 97 months' imprisonment, to be followed by a three-year term of supervised release, a fine of $25,000, and forfeiture of $228,388. On appeal, Ware contends, inter alia, that his right to be free from double jeopardy was violated, that the evidence was insufficient to support his convictions, and that the court made errors in sentencing. We find no merit in any of Ware's contentions except his challenge to the sufficiency of the district court's sentencing findings as to his role in the offenses. On that issue, we remand for additional proceedings; in all other respects we affirm.

I.  BACKGROUND

The present prosecution focused on the conduct of Ware with respect to a "pump and dump" scheme from December 2001 through April 2002, involving the issuance of fraudulent press

releases that artificially inflated the prices of the publicly traded shares of two small companies: Service Systems International, Ltd. ("Service Systems"), and Investment Technology, Inc. ("Investment Technology"). The government's evidence at trial included press releases issued at Ware's behest; testimony from two participants in the drafting of the press releases, Jeremy Jones and Carleton Epps; charts showing increases in price and trading volume of the companies' shares corresponding to the dates on which such press releases were issued; and testimony from several investors who invested in Investment Technology in reliance on Ware's press releases, only to see the stock become worthless when the artificially inflated prices plummeted. As discussed in Part II.B. below, the press releases contained materially false and misleading representations favorable to the companies, and/or omitted material information that was unfavorable, causing their stock prices to rise. Ware, who had acquired stock in the companies, sold most of his stock while causing the false press releases to be issued, reaping profits of more than $200,000 in a five-month period.

Ware was tried on one count of securities fraud and one count of conspiracy to commit securities fraud and wire fraud. After a first trial ended in a mistrial, necessitated by the illness of Jones (see Part II.A. below), Ware was retried and convicted on both counts. He was sentenced principally as indicated above, calculated as discussed in Part III below.

## II. CHALLENGES TO THE CONVICTION

On appeal, Ware makes numerous challenges to his conviction, including contending that his prosecution was the product of government misconduct, that the district judge should have recused himself, that his right to be free from double jeopardy was violated, and that the evidence was insufficient to support his conviction on either count. We reject Ware's charges of government misconduct--and his contention that he should have been allowed to argue to the jury that there was such misconduct--substantially for the reasons stated by the district court in an Order dated January 8, 2007, and in an in limine ruling on the record on May 19, 2006. We reject Ware's contention that the district judge should have recused himself, as we find in the record no basis for recusal. We reject Ware's double jeopardy and sufficiency challenges for the reasons that follow.

### A. The Double Jeopardy Contention

Ware's first trial began on January 15, 2007. The government's principal witness was Jones, who described his participation in Ware's securities fraud scheme and authenticated numerous exhibits for admission into evidence. (See, e.g., Transcript of First Trial at 198-202, 214-15.) When the trial was adjourned for the weekend on Thursday, January 18, Ware was in the process of cross-examining Jones. During the weekend, Jones was hospitalized, suffering from elevated blood pressure and kidney

failure. With Ware's consent, the trial resumed on Monday, January 22, with testimony from other government witnesses. On Tuesday morning, the government reported that it had been unable to obtain more information as to Jones's condition, and it proffered the name and telephone number of Jones's attending physician to Ware and the court. Ware moved for a mistrial, arguing that having a hiatus of a week or more during his cross-examination of Jones would be unduly prejudicial. (See id. at 618.) The government opposed the motion, and the district court denied it. (See id. at 620-23.)

On Tuesday afternoon, the government relayed to Ware and the court the physician's evaluation of Jones and inability to predict when Jones might be discharged from the hospital. Ware again moved for a mistrial; the court postponed a ruling and continued the trial that afternoon. (See id. at 740-44.) Later in the day, an affidavit was received from Jones's physician stating that Jones was critically ill and would require hospitalization for an indefinite period of time. Ware again moved for a mistrial, arguing that, as a practical matter, the jury would be unable to disregard Jones's testimony and the evidence admitted through his testimony. (See id. at 798-99.) Although the government urged the district court to wait a few days to see whether Jones's condition improved, the court found it clear that Jones would not be returning to testify soon; and it granted Ware's motion. The court noted that

> [t]here is no constitutional issue presented here
> because the defendant has moved for a mistrial; and

> it seems to me not to grant it would simply raise potential Sixth Amendment issues, because the defendant has not had an opportunity to complete his cross-examination of Mr. Jones.

(Id. at 801.)

Ware thereafter moved to dismiss the indictment on the ground that he could not be retried because of his right to be free from double jeopardy. That motion was denied, and his new trial began in April 2007. On this appeal, Ware pursues his contention that the Double Jeopardy Clause precluded any retrial.

The Double Jeopardy Clause of the Fifth Amendment generally protects a defendant from successive prosecutions for the same offense. See, e.g., Oregon v. Kennedy, 456 U.S. 667, 671 (1982); United States v. Dinitz, 424 U.S. 600, 606 (1976). However, where the original trial has not been completed because the defendant himself moved for a mistrial, "he is deemed to have deliberately elected 'to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'" United States v. Rivera, 802 F.2d 593, 597 (2d Cir. 1986) (quoting United States v. Scott, 437 U.S. 82, 93 (1978)). Thus, when a mistrial has been granted on motion of the defendant, a retrial is normally not barred by the Double Jeopardy Clause unless the government engaged in conduct that was "intended to 'goad' the defendant into moving for a mistrial." Kennedy, 456 U.S. at 676; see, e.g., Dinitz, 424 U.S. at 611 (Double Jeopardy Clause "protect[s] a defendant against governmental actions intended to provoke mistrial requests").

- 6 -

In the present case, the mistrial was sought by Ware, and the district court granted it over the objection of the government. There is no indication whatever in the record that Jones's absence from the trial after January 18 was procured by the government or that the government engaged in any conduct designed to cause a mistrial or goad Ware into moving for a mistrial. Accordingly, Ware's double jeopardy challenge is meritless.

B. The Sufficiency Challenges

Ware challenges the sufficiency of the evidence to support his securities fraud conviction, arguing principally (a) that the government failed to call as witnesses any auditors or forensic accountants to testify that any of the statements in the press releases were false or misleading, and (b) that there was no proof that those statements were material, i.e., that they had any impact on the trading volume in the shares of Service Systems or Investment Technology. In challenging the sufficiency of the evidence to support his conviction of conspiracy to commit securities fraud and wire fraud, Ware contends principally that there was insufficient evidence of a conspiratorial agreement, pointing to testimony from Epps and Jones suggesting that they had not knowingly conspired to manipulate the Service Systems and Investment Technology stock. These contentions are meritless.

In reviewing a defendant's challenge to the sufficiency of the evidence to support his conviction, we must view all of the

evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, see, e.g., United States v. Josephberg, 562 F.3d 478, 487 (2d Cir. 2009); United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008), cert. denied, 129 S. Ct. 1027 (2009); United States v. Leonard, 529 F.3d 83, 87 (2d Cir. 2008). Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. See, e.g., United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004); United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998); United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998). "The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony . . . ." United States v. Josephberg, 562 F.3d at 487; see, e.g., United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980). These principles apply whether the evidence is direct or circumstantial. See, e.g., Glasser v. United States, 315 U.S. 60, 80 (1942). The conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

The evidence at Ware's second trial, taken in the light most favorable to the government, included the following. In 2001, Ware was an attorney who operated a small firm called

Rosenfeld, Goldman & Ware ("RGW"), which held itself out as both a law firm and an investment bank. (See, e.g., Transcript of Second Trial ("Tr.") at 300.) In late 2001, Ware hired Jones and Epps, young men who were previously employed by Jackson, Shanklin & Sonia (or "JSS"), a small securities firm that had leased office space from RGW until October 2001. Jones and Epps testified that Ware instructed them to search the internet for small publicly traded companies that had "reasonable" trading volume and whose share price was below $1. (Id. at 299; see id. at 737-38.) Jones and Epps were to contact companies that fit that profile and inquire whether they would like help from Ware in promoting their stock; in exchange, Ware would require advance payments of cash or of stock that could be sold immediately upon receipt without restrictions. (See id. at 301-02, 738-40.)

Service Systems and Investment Technology entered into such agreements with Ware's firm; and brokerage accounts controlled by Ware ultimately received a total of 2.5 million shares of Service Systems stock (see id. at 985) and 7.5 million shares of Investment Technology stock (see id. at 968-69). After the initial shares were received, Ware began editing, approving, and issuing press releases that he caused to be distributed nationwide through Business Wire and Internet Wire, companies engaged in the electronic distribution of press releases and other material on a large scale. The press releases promoting Service Systems and Investment Technology did not disclose the involvement or role of Ware; rather, Ware had his part-time clerical assistant

- 9 -

Myron Williams, who owned a defunct credit consulting business called MW Financial Services, send the releases to Business Wire and Internet Wire, using the MW Financial Services name and website. (See Tr. 226-28, 885-93.)

The Ware-generated press releases introduced at trial were false and misleading in three ways. First, they attributed statements and evaluations to sources that were said to be independent of each other and of the issuer of the stock being promoted. In fact, however, some of the information in the press releases for Investment Technology came from its president; other information as to both Investment Technology and Service Systems was fabricated by Jones and Epps; and the entities cited were not sources of factual information at all. One supposed source was MW Financial Services, Williams's credit consulting company, which was defunct. Another was JSS, which had never employed stock analysts, had never made stock recommendations, and never issued press releases; during the period in question, JSS's principal worked from his home and was unaware that the JSS name was being used by Ware. (See id. at 480-88.) A third purported source, Centennial Advisors, was a company that had been created by Epps and Jones but was not operational. (See id. at 788.) A fourth, called Small Cap Research Group, was a company set up by Ware. (See id. at 859.) Ware instructed Epps and Jones, in drafting press releases, to make it appear that there were "more entities" analyzing these companies because it would be better "for the price of the stock." (Id. at 322; see also id. at 346-47 (Ware

- 10 -

also instructed Epps "to get on . . . ragingbull.com"--which Epps described as "an investment community bulletin board" and "on Yahoo [which] has that same feature"--and "post favorable comments" about Service Systems and Investment Technology "<u>under an . . . assortment of screen names</u>" (emphasis added)).) In fact, Ware was responsible for all of the favorable statements in the press releases, as the releases were written by Epps or Jones and edited or approved by Ware. (See, e.g., id. at 756-57, 784-85.)

Second, the press releases did not disclose that Service Systems and Investment Technology had paid Ware to prepare the promotional press releases. Any receipt and amount of such compensation are material information, the disclosure of which is required by law, see 15 U.S.C. § 77q(b).

Third, the press releases that Ware caused to be issued contained false and baseless statements about the business and financial circumstances of Service Systems and Investment Technology. Jones testified that he helped "prepare and issue false press releases . . . . [t]o drive up the price of a stock." (Tr. 732) He testified that he never saw or heard anything to support those releases. For example, a December 6, 2001 press release claimed that JSS rated the Service Systems (or "SVSY") stock a "Speculative Strong Buy," with a target price of 77 cents a share, which was more than five times the stock's price at that time (Government Exhibit ("GX") 20-R); a December 10 press release, which was also attributed to JSS, "Reiterate[d] Speculative Strong Buy....$0.45 - $0.65 In Short Term" (GX 21-R);

- 11 -

and a December 11, 2001 press release attributed to Centennial Advisors a prediction that the SVSY share price would triple in five business days (see GX 22-R; see also GX 93-A). In fact, SVSY's then-most recent quarterly report to the SEC, filed on November 13, stated that SVSY "has not recognized revenue to date and has accumulated operating losses of approximately $2,400,000 since inception"; that although SVSY was attempting to raise additional equity capital, "there is no assurance that any such activity will generate funds that will be available for operations"; and that "[t]hese conditions raise substantial doubt about the Company's ability to continue as a going concern." (GX 2, at 9.)

A press release for SVSY on Thursday, January 10, 2002, stated (a) that "[f]inancing talks reportedly in excess of 20 million dollars will provide the cash infusion [that Service Systems] needs," and (b) that "Carlton [sic] Epps, Micro-Cap Analyst at Jackson, Shanklin & Sonia" recommended SVSY stock and believed that it "could very well return up to 400% from current levels." (GX 25-R.) In fact, however, JSS never employed stock analysts (see Tr. 480); Epps never made stock price predictions (see id. at 321-22); and Jones had no reason to believe there were any $20 million financing negotiations (see id. at 831, 861). On January 11, 2002, Ware sent Service Systems an e-mail stating that "currently the bid has risen 40% since our P/R of Thursday.....the market is positive on the prospects for the company. . . . Our

- 12 -

strategy will definitely work if everybody does their part on the team." (GX 66.)

Ware's earlier press releases for Service Systems had had similarly desirable effects on its share price in December. On December 3, 2001, the closing price of Service Systems stock was 14 cents a share, on a trading volume of 146,100 shares. (See GX 93.) After the press releases by Ware on December 6, 10, and 11, 2001, the December 11 closing price was 22 cents a share, with 670,600 shares traded, reflecting increases of more than 57 percent in price and more than 359 percent in volume in six trading days. (See id.)

As to Investment Technology (or "IT Inc."), Ware caused press releases to be issued on, among other days, February 4, 5, 6, 7, and 8. On January 30, 2002, Investment Technology stock had closed at 2½ cents a share, with 800,100 shares traded. (See GX 92.) Ware's February 4, 2002 press release estimated that IT Inc.'s profits would grow at the rate of 30 percent a year and that its "stock price [would] accelerat[e] to the mid $0.40 with [sic] the next 2 months on strong volume." (GX 31-R.) By February 4, the closing price of an IT Inc. share was double the January 30 closing price; and the February 4 trading volume was 1,104,200 shares, whereas only 77,000 shares had been traded on the previous trading day. (See GX 92.) Ware's February 5, 2002 press release attributed to Small Cap Research Group a description of IT Inc. as a "leader in the online gaming industry," referred to "estimated EPS [earnings per share] of $0.15-0.25," and stated

that IT Inc.'s share price was expected to increase to "$1.50-2.50 within the next 12 months"; the release cited a report on the MW Financial Services website. (GX 32-C.) In fact, Small Cap Research Group was owned by Ware; MW Financial Services was merely a website that belonged to Williams and was controlled by Ware; and the online gambling report on the website had been prepared by Epps. When Epps was asked about the supposedly expected 12-month price target of $1.50-$2.50, he testified that the calculation of a price target "starts with the financial statements of that company" and that, as of the date of the press release, he had no financial statements for IT Inc. (Tr. 339.) When asked about the basis for the press release's estimate of 15-25 cents per share as IT Inc.'s earnings, Epps testified that IT Inc. "was not an operating company. Therefore, it didn't have any earnings." (Id. at 687.)

Ware also caused to be issued a February 7, 2002 press release that attributed to Centennial Advisors a recommendation of Investment Technology as a "Strong Buy" and stated that IT Inc. had accepted more than 100,000 bets totaling more than $4 million in connection with the February 3, 2002 Super Bowl. (GX 34-C.) In fact, however, IT Inc. had no operations and had not taken a single Super Bowl bet. (See, e.g., Tr. 845 ("actually, they didn't do any money" (internal quotation marks omitted).) Jones testified that some of the information in this press release had come from IT Inc.'s president (see id. at 800), but that the $4 million figure was his and Epps's hypothesis as to the amount

- 14 -

that could have been bet with IT Inc. on "that type of day" based on sports betting statistics they found on the internet (id. at 801). And as to the press release statement that 100,000 bets had been placed, Jones testified, "That is the information that Carlton [sic] and I made up." (Id. at 800-01.)

After the SEC began an investigation in 2003 into the trading in Investment Technology stock, Ware prepared an affidavit for Williams that was designed to exculpate Ware with respect to the February 7, 2002 press release. Williams testified at trial that he signed the affidavit without carefully reading it, relying on Ware because Ware said it was merely a document that he had forgotten to have Williams sign, Ware was an attorney, and Williams trusted him (see id. at 902-06, 915). The affidavit stated that the release was a draft that had been sent out inadvertently, that Ware and Williams had called Business Wire and explained the error, and that they had asked that the release be withdrawn. (See GX 80.) Although Ware submitted this affidavit to the SEC, Williams testified that each of these statements was false (see Tr. 912-14).

A February 13, 2002 press release (introduced as GX 37-C) prepared by Jones and attributed to Centennial Advisors, stated that IT Inc. was "aligning itself with takeover targets" that had good business prospects in terms of "content" and "established customer base" and was "allocating roughly an estimated 45 percent of its operating budget to advertising." (Tr. 788 (internal quotation marks omitted).) In fact, Jones had no information to

support his statements about IT Inc.'s budget; he testified, "They had no budget." (Id.)

During the period in which Ware was having the falsely favorable press releases issued, he was selling most of the stock he had received as compensation for creating the press releases. In December 2001 and January 2002, he sold 375,000 of his Service Systems shares, making a profit of $57,670. (See id. at 987.) From the end of January to mid-April 2002, Ware sold some 7,000,000 of his Investment Technology shares, making a profit of $170,718. (See id. at 974-75; GX 100-B.)

We conclude that the evidence at trial was ample to permit the jury to find that Ware, in connection with the purchase or sale of securities of Service Systems and Investment Technology, directly or indirectly used instrumentalities of interstate commerce "[t]o make . . . untrue statement[s] of . . . material fact[s] or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5, and hence was guilty of securities fraud. Ware's argument that there were certain types of evidence that the government did not present does not detract from the fact that the evidence the government did present--both direct and circumstantial--was sufficient to prove Ware's guilt beyond a reasonable doubt.

The above evidence was also ample to permit the jury to find Ware guilty of conspiracy in violation of 18 U.S.C. § 371, i.e., that Ware (a) entered into an agreement with others,

- 16 -

including at least Epps and Jones, to perpetrate the securities fraud scheme by means of wire communications, and (b) committed one or more overt acts in furtherance of that agreement.

## III.  SENTENCING CHALLENGES

In determining Ware's sentence, the district court first calculated the imprisonment range recommended by the advisory Sentencing Guidelines ("Guidelines"). It found that Ware's Guidelines base offense level was 6, see Guidelines § 2B1.1(a)(2), and that that level should be increased by 12 steps pursuant to § 2B1.1(b)(1)(G) either because the losses caused by Ware's offenses totaled more than $200,000 or because his gains from the sale of the Service Systems and Investment Technology stock exceeded $200,000. (See Sentencing Transcript, October 26, 2007 ("S.Tr."), at 69-70.) Ware's offense level was further increased by four steps because his offenses involved 50 or more victims, see Guidelines § 2B1.1(b)(2); four steps on the ground that Ware was an organizer or leader of a scheme that involved five or more participants or that was otherwise extensive, see id. § 3B1.1(a); two steps on the ground that Ware, having been retained as an attorney for Service Systems and having made improper regulatory filings with respect to that company in order to benefit himself at its expense, abused a position of trust, see id. § 3B1.3; and two steps on the ground that his submission of the false Williams affidavit to the SEC constituted an attempt to obstruct justice,

- 17 -

see id. § 3C1.1. (See S.Tr. 70-71.) Ware's total offense level was thus 30; given his criminal history category of I, the Guidelines-recommended range of imprisonment was 97-121 months. After considering the factors set out in 18 U.S.C. § 3553, the court concluded that a reasonable term of imprisonment for Ware was 97 months.

Ware challenges most of the court's Guidelines calculations. We question only the adjustment for leadership role.

## A. Leadership Role

The advisory Guidelines specify a four-step upward adjustment in offense level if "the defendant was an organizer or leader of a criminal activity that involved five or more participants," Guidelines § 3B1.1(a)--including the defendant, see, e.g., United States v. Paccione, 202 F.3d 622, 625 (2d Cir.), cert. denied, 530 U.S. 1221 (2000)--"or was otherwise extensive," Guidelines § 3B1.1(a). Before imposing a role adjustment, the sentencing court must make specific findings as to why a particular subsection of § 3B1.1 adjustment applies. See, e.g., United States v. Espinoza, 514 F.3d 209, 212 (2d Cir.) ("[o]ur precedents are uniform in requiring a district court to make specific factual findings to support a sentence enhancement under U.S.S.G. § 3B1.1") (internal quotation marks omitted), cert. denied, 128 S. Ct. 2458 (2008); United States v. Carter, 489 F.3d 528, 538 (2d Cir. 2007) ("Carter"), cert. denied, 128 S. Ct. 1066

(2008); United States v. Huerta, 371 F.3d 88, 93 (2d Cir. 2004); United States v. Molina, 356 F.3d 269, 275 (2d Cir. 2004); United States v. Patasnik, 89 F.3d 63, 68 (2d Cir. 1996) ("A court must . . . make two specific factual findings before it can properly enhance a defendant's offense level under § 3B1.1(a): (i) that the defendant was 'an organizer or leader,' and (ii) that the criminal activity either 'involved five or more participants' or 'was otherwise extensive.'").

The findings of the sentencing court must be sufficiently specific to permit meaningful appellate review. It is not enough for the court merely to repeat or paraphrase the language of the guideline and say conclusorily that the defendant meets those criteria. In Carter, for example, the district court applied the four-step role enhancement, stating,

> the thing that I wrestled with was the defendant's role in the offense. 3B1.1(a) states that if a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, then he can be liable. I think that this covers this defendant.

489 F.3d at 539 (emphasis added) (internal quotation marks omitted). We concluded that this statement was "far too general to support a role enhancement." Id.

Further, although a sentencing court may sometimes satisfy its obligation to make findings by adopting the factual statements in the defendant's presentence report ("PSR"), see, e.g., United States v. Molina, 356 F.3d at 275-76, adoption of the PSR does not suffice if the PSR itself does not state enough facts to permit meaningful appellate review, see, e.g., Carter, 489 F.3d at 540.

In Carter, for example, the PSR that was adopted by the district court "simply made reference to [a witness's] testimony that [the defendant] supplied drugs to at least 10 dealers." Id. We concluded that the PSR's findings were inadequate, and hence their adoption was not sufficient.

In the present case, because Ware did not object to the role adjustment in the district court on the ground that the court failed to make adequate findings, his present challenge to the sufficiency of the findings is reviewable only for plain error. See, e.g., Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993). Under this standard, a party is not to be granted relief unless there was "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting Olano, 507 U.S. at 732). "If all three conditions are met," we have discretion to grant relief "only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Johnson, 520 U.S. at 467 (quoting Olano, 507 U.S. at 732 (other internal quotation marks omitted)). In conducting plain-error review of sentencing issues, we have stated that when the district court's statement provides "an insufficient basis . . . for us to determine why the district court did what it did," that is an error that affects a defendant's "substantial rights." United States v. Lewis, 424 F.3d 239, 247 n.5 (2d Cir. 2005). In Lewis, addressing a failure to comply with the statutory provision that "[t]he court, at the time of sentencing, shall state in open court

the reasons for the imposition of the particular sentence," 18 U.S.C. § 3553(c), especially when the sentence is outside the range recommended by the advisory Guidelines, see id. § 3553(c)(2), we concluded that the fourth component of the plain-error test was met because the absence of a meaningfully explanatory statement undermines "understanding of, trust in, and respect for the court and its proceedings on the part both of those who are themselves parties to the proceeding and those who are not." 424 F.3d at 247. In Carter, applying Lewis's analysis, we concluded that the district court's conclusory finding as to the defendant's leadership role and its "reliance on the inadequate findings of the PSR, without more, constituted plain error," 489 F.3d at 540.

In the instant case, in finding that the four-step increase in offense level was warranted for Ware "because the defendant was the organizer and leader of this conspiracy" (S.Tr. 70), the district court stated as follows:

> [W]ith respect to the aggravating role enhancement that I have imposed, it obviously involved a criminal enterprise with _five or more participants_ and unknowing participants _and was otherwise extensive_. It took place over a period of time. All the activities of the knowing and unknowing participants were organized or led by Mr. Ware with specific criminal intent to defraud the investing public. And of course the services of those unknowing participants, the wire services that published his false press releases, etc., they were all peculiar and necessary to the criminal scheme.

(Id. at 72-73 (emphases added).) We have several difficulties with this explanation as to the number of participants or the extensiveness of the criminal activity.

- 21 -

First, the Guidelines define a "'participant'" in the criminal activity as a person who, though perhaps not convicted, "is criminally responsible for the commission of the offense." Guidelines § 3B1.1, Application Note 1. If the above statement by the district court was meant as a finding that there were five or more participants within the meaning of § 3B1.1, it lacks the specificity needed to allow us to conduct a meaningful review, as there were only four obvious participants here: Ware, Epps, Jones, and Williams. The government, on this sentencing issue, argues to us that IT Inc.'s chief executive officer ("CEO") was also a participant because he knew of the falsity of Ware's February 7, 2002 press release. (See Government brief on appeal at 84, 86.) But in arguing the issue of Ware's guilt, the government states that IT Inc.'s CEO was upset at the press release because of its falsity and that he "complained to Epps that it needed to be retracted." (Id. at 15 (citing Tr. 340-41, 787).) In sentencing Ware, the district court made no finding that the IT Inc. CEO was criminally responsible, and we cannot endorse the role enhancement on the basis of the government's speculation as to what the sentencing judge had in mind.

Second, the district court's reference to "unknowing participants" (S.Tr. 72) sheds no greater light on the court's finding that the five-participant aspect of the § 3B1.1 criteria was met. To the extent that the court was referring to the wire services utilized by Ware, it surely appears that they were unknowing and that their services were necessary for the execution

- 22 -

of his scheme; but the record does not indicate that they could be considered "participants" within the above Guidelines definition of that term, for we see no indication in the record that they would be criminally liable. To the extent that, by "the services of . . . unknowing participants" who had been "organized or led by Mr. Ware" (S.Tr. 73, 72), the court was referring to services provided by persons other than the wire services, it is not clear to what services the court was referring or who those persons were. And even if such a person were identified by the district court, we could not, without some explanation by the court, conclude that an individual who contributed unknowingly should be considered "criminally responsible," Guidelines § 3B1.1, Application Note 1.

Finally, while the Guidelines instruct the sentencing court that,

> [i]n assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive,

id. § 3B1.1, Application Note 3 (emphasis added), it is not clear what facts the court had in mind when it stated that Ware's criminal activity was "otherwise extensive" (S.Tr. 72). Although the court's next sentence stated that "[i]t took place over a period of time" (id.), that consideration, standing alone, would not be a sufficient basis. If it were, any activity that, like Ware's, spanned some five months would be "otherwise extensive," and the defendant leader or organizer would automatically have his

- 23 -

advisory Guidelines offense level increased by four steps (or by three steps if he were a manager or supervisor, rather than a leader or organizer, see Guidelines § 3B1.1(b)). The district court went on to refer to Ware's use of the wire services; but it is not clear whether the court meant to imply that the mere use of wire services makes a criminal activity "otherwise extensive" within the meaning of § 3B1.1--a principle that, again, would seem to expose any leader/organizer or supervisor/manager defendant whose offense involved use of the wires (as might any wire fraud or conspiracy to commit wire fraud) to an automatic four- or three-step increase in offense level.

In sum, we conclude that the findings of the district court are not sufficient to reveal the factual basis for the court's conclusion that Ware's criminal activity involved five or more "participants" or was "otherwise extensive" within the meaning of Guidelines § 3B1.1(a).

B. Other Sentencing Challenges

Ware's other sentencing challenges are meritless and do not require extended discussion. The 12-step enhancement of Ware's offense level pursuant to Guidelines § 2B1.1(b)(1)(G) for the amount of loss caused by his offenses was justified either by evidence that investors in SVSY and IT Inc. lost some $397,000 during the relevant period (see Government's Sentencing Submission, August 14, 2007, Exhibits 2 and 3), or by the evidence that Ware, in selling stock that he received as compensation for

- 24 -

his fraudulent services, received a total of $228,338 (see, e.g., Tr. 974-75, 987, 1006). The four-step adjustment pursuant to § 2B1.1(b)(2) was based on the finding that more than 50 victims were involved, a finding that was not clearly erroneous in light of the government's introduction of the names of 383 investors who bought shares of Service Systems or Investment Technology during the period of Ware's manipulation of the market for those shares (see Government's Sentencing Submission, August 14, 2007, Exhibits 2 and 3). Nor do we see any error in the court's two-step adjustment pursuant to § 3C1.1 for obstruction of justice. That adjustment, based on Ware's filing of the false Williams affidavit in the SEC civil investigation, which dealt with the same conduct for which Ware was found criminally liable here, was appropriate. See, e.g., United States v. Fiore, 381 F.3d 89, 94 (2d Cir. 2004).

As to the increase in offense level for abuse-of-trust, Ware appears to pursue a contention he made in the district court, namely that he had no fiduciary duty to any of the investors allegedly victimized by his press releases (see Ware reply brief on appeal at 87-88). This adjustment, however, was imposed not on the basis that Ware held a position of trust toward investors but rather that he held such a position toward one of the companies whose stock he was promoting and which had retained him to perform legal services. (See S.Tr. 70.) In sentencing Ware, the district court so stated with respect to Service Systems (see id.); in fact, the only evidence we have seen on this point showed that

- 25 -

Ware had such a relationship not with Service Systems (see GX 61), but rather with IT Inc. (see GX 70, at 1 (RGW "shall provide any and all SEC Legal Counsel to Investment Technology")). The court's misstatement that Ware was retained as legal counsel by Service Systems, rather than by IT Inc., was not raised in the district court and has not been argued on appeal, and hence that issue has been forfeited. And even had that error been raised on appeal, it would provide no basis for relief as it clearly did not affect Ware's substantial rights.

Finally, there is no merit in Ware's contention that the court erred in ordering him to forfeit $228,388. The government presented evidence that Ware gained that amount in selling stock he received as compensation for devising and orchestrating his pump-and-dump scheme. The district court properly found by a preponderance of the evidence, see, United State v. Fruchter, 411 F.3d 377, 383 (2d Cir. 2005), that Ware gained $228,388, and we see no error in the ruling that he should forfeit that amount.

CONCLUSION

We have considered all of Ware's contentions on this appeal and, except as indicated above with respect to the sentencing enhancement for his role in the offense, we have found them to be without merit. Ware's conviction is affirmed; we remand for further proceedings with regard to his sentence.

In Carter, in which we concluded that the district court's findings as to the defendant's leadership role were inadequate to permit meaningful appellate review, we remanded for resentencing. But we did so in that case because there were other errors as well. In the present case, the lack of adequate findings as to Ware's role is the only material defect we have found. Accordingly, we remand to the district court either for supplementation of the record with findings as to why the criteria of § 3B1.1(a) are met, or, if the court concludes that those criteria are not met, for resentencing.

The mandate shall issue forthwith. If the district court supplements the record in accordance with the foregoing, this appeal will be reinstated--without the need for a new notice of appeal--upon notice by either party to this Court by letter within 14 days of such supplementation. If the district court resentences Ware, any party wishing to appeal must file a new notice of appeal. In either event, the matter shall be referred to this panel.