14-2082-cr (L)
United States v. Kent

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2015

(Argued: September 1, 2015          Decided: May 16, 2016)

Nos. 14-2082-cr (L); 14-2874-cr (CON)

―――――――――――――――――――――――

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

THOMAS JEFFERSON KENT, ALSO KNOWN AS SEALED DEFENDANT 1,
ALSO KNOWN AS DARYL WALKER,

SANFORD GOTTESMAN, ALSO KNOWN AS SEALED DEFENDANT 2,

*Defendants-Appellants*,

BRAD ROBINSON, ALSO KNOWN AS SEALED DEFENDANT 3,
BENO MATTHEWS, ALSO KNOWN AS SEALED DEFENDANT 4,

*Defendants*.

―――――――――――――――――――――――

Before:     HALL, LIVINGSTON, *Circuit Judges*, and HELLERSTEIN, *District Judge*.*

―――――――――――

* The Honorable Alvin K. Hellerstein, of the United States District Court for the Southern District of New York, sitting by designation.

1

Defendant Thomas Jefferson Kent appeals from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), entered on July 28, 2014, following his guilty plea. At sentencing, the district court found that Kent was the leader or organizer of an "otherwise extensive" criminal scheme and was thus subject to a four-level enhancement under U.S.S.G. § 3B1.1(a). We conclude that the district court's application of the enhancement was not supported by sufficient factual findings. Accordingly, the sentence is VACATED and the case REMANDED as to Kent with instructions that he be resentenced. Defendant Sanford Gottesman also appeals from a judgment of conviction in the United States District Court for the Southern District of New York (Forrest, *J.*), entered on June 10, 2014, following a jury trial. A summary order issued concurrently with this opinion addresses Gottesman's claims on appeal.

FOR APPELLEE:

PAUL M. MONTELEONI, Karl Metzner, Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for the United States of America.*

FOR DEFENDANTS-APPELLANTS:

YUANCHUNG LEE, Federal Defenders of New York, New York, NY, *for Thomas Jefferson Kent.*

LAWRENCE H. SCHOENBACH, Law Offices of Lawrence H. Schoenbach, PLLC, New York, NY, *for Sanford Gottesman.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This appeal by Thomas Jefferson Kent arises from a wire fraud conspiracy case against Kent, Sanford Gottesman, Brad Robinson, and Beno Matthews,[1]

---

[1] Matthew's name is spelled inconsistently throughout the record as well as in the case caption of this appeal. This opinion will use "Beno Matthews" or "Matthews."

who were each convicted in connection with their participation in an "advance fee" scheme—a scheme in which supposed lending companies operated by the defendants falsely promised loans to small businesses and collected fees for fraudulent expenses, while never issuing any loans. Following their arrests and indictment in February 2014, Kent, Robinson, and Matthews entered guilty pleas. [2] Kent now appeals from a sentence of, *inter alia*, 78 months' imprisonment, which was imposed after he pleaded guilty on February 19, 2014, to conspiring to commit wire fraud in violation of 18 U.S.C. § 1349. On appeal, Kent contends that the district court erred in determining that he was a leader or organizer of an "otherwise extensive" criminal activity and was thus subject to a four-level sentencing enhancement under § 3B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G."). For the reasons set forth below, we vacate the sentence and remand for resentencing.

---

[2] Gottesman proceeded to a jury trial. On March 7, 2014, after a four-day trial, the jury found Gottesman guilty of conspiring to commit wire fraud in violation of 18 U.S.C. § 1349, and committing wire fraud in violation of 18 U.S.C. §§ 1343 and 2. The district court (Forrest, *J.*) sentenced Gottesman on June 9, 2014, to 36 months' imprisonment, three years of supervised release, and a mandatory $200 special assessment, and ordered him to pay $165,371.26 in restitution and to forfeit the same amount. We consider Gottesman's appeal in a summary order filed concurrently with this opinion.

# BACKGROUND

## I. Factual Background[3]

The scheme began in 2007, when Kent formed FDP Capital, LLC, to pose as a private investment banking firm willing to provide funding for small businesses. Through FDP Capital, Kent would contact small businesses seeking funding and represent that FDP Capital could provide them with loans. After collecting so-called advance fees from these businesses for various expenses, however, FDP Capital never issued any loans.

Kent recruited Robinson to work for FDP Capital as a broker. Robinson would find and contact prospective customers, solicit and review a "quick information form" submitted from interested businesses, and in turn send those businesses a "letter of intent" setting forth FDP Capital's intent to extend a loan. The letter of intent explained that, before wiring the funds for the loan, FDP Capital would need to conduct certain due diligence. In order to do so, FDP Capital asked the businesses to pay an advance fee to cover expenses, often

---

[3] The factual background presented here is drawn from the district court's factual findings at Kent's sentencing, from the United States Probation Department's Pre-Sentencing Report ("PSR") as to Kent (which was not objected to and which the court adopted as factual findings with minor discrete changes), and, where noted, from undisputed testimony presented at Gottesman's trial. References in the form "K.A.__" are to Kent's appendix, submitted on appeal.

including the cost of a "site visit" to meet the principals, review the loan proposal, and discuss repayment expectations. Kent and Robinson would conduct those visits themselves.

Through FDP Capital, Kent and Robinson obtained more than $325,000 in advance fees from more than 60 businesses. None of the businesses, however, ever received a loan. After securing the advance fee, FDP Capital would end all contact with the defrauded business, which would find itself unable to reach FDP Capital to inquire about its loan. As a result, many so-called customers filed online complaints about FDP Capital and Kent.

Following the posting of Internet complaints, Kent started a new company, Phoenix Global Holdings, Inc., to perform the same scheme as FDP Capital. He began using aliases—all variations of his name such as Tom Kent, Jeff Kent, and Thomas Jefferson—when communicating with prospective customers. Although Kent still conducted site visits and interacted with customers himself, he no longer did so without using an alias. He also no longer signed any customer documents.

In or around the summer of 2009, Robinson stopped working for Kent for a time, and Kent met and recruited Gottesman to assist in the fraudulent scheme.

They agreed to go into business together in September 2009. Gottesman took on the role of conducting the site visits. Kent then enlisted Robinson once more and tasked him with maintaining the mass marketing e-mail server and signing letters of intent. Robinson would also keep Gottesman apprised of the status of client contacts for those businesses Gottesman had visited or was to visit.

During this time the scheme grew, with the co-conspirators sometimes demanding not only advance fees, but also additional fees for fictitious bonds to secure the purported loans. Kent, under new aliases such as "Dan Green" or "Mike Ryan," spoke with businesses about acquiring those additional payments to secure "investments" from one of the Wilshire entities.

In June 2010, Kent and Gottesman had a falling out. The two men nevertheless continued the same scheme, individually, at Wilshire Financial, Inc., Wilshire Capital, Inc., and subsequently at other entities. Kent recruited Matthews, who had previously helped with technology services, and continued substantially the same scheme through three new companies: Vouyer Capital LLC, Midwest Global Partners, Inc., and Northeast, Inc.

## II. Plea and Sentencing Proceedings

Kent pleaded guilty on February 19, 2014, pursuant to a plea agreement that calculated a Guidelines total offense level of 22.[4] Based on a criminal history category of I, Kent's stipulated Guidelines range was 41 to 51 months' incarceration. The United States Probation Office subsequently prepared a PSR that arrived at the same Guidelines range. On July 15 and 18, 2014, Kent and the Government filed submissions with the district court in anticipation of sentencing. Kent requested a downward deviation from the Guidelines range, asking that the court impose a 36-month prison sentence. The Government requested that the court impose an incarceration period within the Guidelines range of 41 to 51 months.

The district court issued an order dated July 23, 2014, two days before sentencing, giving the parties notice of its belief that two additional sentencing enhancements were applicable: a two-level increase for employing "sophisticated

---

[4] The parties agreed that the base offense level was 7 pursuant to U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1); that this level was increased by 14 pursuant to § 2B1.1(b)(1)(H), based on a loss amount greater than $400,000 but less than $1,000,000; and that the offense involved 50 or more victims, raising the offense level by 4 additional levels pursuant to § 2B1.1(b)(2)(B). The offense level was then decreased by 3 levels pursuant to § 3E1.1(a), (b), on account of Kent's timely acceptance of responsibility, for a total offense level of 22.

means," U.S.S.G. § 2B1.1(b)(10), and a four-level increase for Kent's leadership role in a "criminal activity that involved five or more participants or was otherwise extensive," *id.* § 3B1.1(a).[5] The same day, Kent filed a letter in response to the district court's order in which, *inter alia*, he sought a continuance of his sentencing hearing so that he might be able to respond to the proposed enhancements. The district court denied Kent's request for an adjournment, stating that Kent would "have ample opportunity to respond at sentencing." K.A. 73.

On July 25, 2014, the district court held Kent's sentencing hearing. As relevant to the § 3B1.1(a) enhancement, the district court found, by a preponderance of the evidence, that Kent was the "mastermind behind the fraudulent schemes," that he had established the corporate entities and the *modus operandi*, that his scheme had a particularly "high degree of contact with the victims," that he had "obtained the most money" among the co-conspirators, and that his scheme "spread over the country, and spread over dozens and dozens and dozens of different people." K.A. 99. On that basis, the district court noted its belief that "there is far more than a preponderance of the evidence upon

---

[5] The district court ultimately declined to impose the § 2B1.1(b)(10) enhancement of two levels for employing sophisticated means.

8

which to base [a] finding of fact as to the aggravating role for leader, organizer of criminal conduct that was otherwise extensive," so as to support a four-level enhancement under § 3B1.1(a). K.A. 100.

At that point, the district court invited argument from the parties. As relevant here, the Government disagreed with the court's calculations and questioned whether the court should apply the § 3B1.1(a) enhancement. The Government stated that "consistent with the plea agreement, [it] respectfully disagree[d] with the court's guidelines calculation" and "ask[ed] the court to follow the calculations set forth in the presentence report and the plea agreement." K.A. 101. Concerning the proper interpretation of § 3B1.1(a), which sets forth an enhancement for leading a criminal activity that involves five or more people or is "otherwise extensive," the Government explained that the scheme here involved "a small number of people just doing the same thing over and over to a lot of victims and that [was], in the lay sense of the word . . . pretty extensive." K.A. 106. But given that "there [was] an adjustment for number of victims and there [was] an adjustment for loss amount," the Government took the position that those factors did not "necessarily support the otherwise extensive finding." *Id.* Kent then argued, relying on *United States v. Ware*, 577

9

F.3d 442 (2d Cir. 2009), that the district court was "misconstruing 'otherwise extensive,'" and that the factors on which the district court relied were not sufficient to support a leadership enhancement.   K.A. 115.

The district court then proceeded to give its final Guidelines calculation. The court reiterated that Kent had been "a leader throughout this case" and that Kent had not objected to the "pieces of the PSR which indicate[d] in the court's view a leadership role."   K.A. 121.   Further, the court emphasized that Kent was "the biggest taker of money in the aggregate."   *Id.*   With those findings of fact, the district court imposed a leadership enhancement, calculating an offense level of 26 (four levels higher than the level in the PSR) and a Guidelines range of 63 to 78 months of incarceration.

Following arguments for mitigation, the district court imposed its sentence on Kent.   The district court explained the reasons for imposing the sentence at length, emphasizing the seriousness of Kent's actions.   Ultimately, the district court stated that its sentence related to "the number of victims, the prolonged conduct, the severe impact on the victims, the need to incapacitate, the devices and artifices . . . used to escape detection, [the] knowledge as to what [Kent was] doing was wrong, [Kent's] lack of sympathy for the victims, [and] the harm that

10

[was] done all across the country."  K.A. 160.  The district court sentenced Kent

to 78 months' imprisonment (at the top of the Guidelines range), three years of

supervised release, and a mandatory $100 special assessment.  It also ordered

Kent to pay $953,232.81 in restitution and to forfeit $950,000.

## DISCUSSION

### I. Standard of Review

We review a sentence for both procedural and substantive reasonableness.

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  When a

district court "makes a mistake in its Guidelines calculation," this constitutes a

procedural error.  *Id.* at 190.  "If we 'identify procedural error in a sentence, but

the record indicates clearly that the district court would have imposed the same

sentence in any event, the error may be deemed harmless, avoiding the need to

vacate the sentence and to remand the case for resentencing.'"  *United States v.*

*Mandell*, 752 F.3d 544, 553 (2d Cir. 2014) (per curiam) (quoting *United States v. Jass*,

569 F.3d 47, 68 (2d Cir. 2009)), *cert. denied*, 135 S. Ct. 1402 (2015).

The district court's interpretation and application of the Sentencing

Guidelines is a question of law, which we review *de novo*.  *United States v.*

*Mulder*, 273 F.3d 91, 116 (2d Cir. 2001).  The Government bears the burden of

11

proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence. *United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011). We review the district court's findings of fact as relevant to the sentencing decision for clear error. *Id.*

## II. The "Otherwise Extensive" Inquiry

This sentencing appeal stems from the district court's application of the leadership enhancement under the Guidelines. Section 3B1.1(a) of the Guidelines provides for a four-level increase to a defendant's offense level if he or she "was an organizer or leader of a criminal activity that involved five or more participants *or was otherwise extensive*." U.S.S.G. § 3B1.1(a) (emphasis added). Because it is uncontested that there were not five or more knowing participants in Kent's criminal activity, this appeal hinges on the proper legal standard for the "otherwise extensive" prong.

Kent contends that the district court erred in applying the enhancement because the term "otherwise extensive" in § 3B1.1(a) refers strictly to organizational size. The task of the district court, he maintains, is "headcount[ing]," Kent Br. at 24, the "knowing" participants in the conspiracy along with the "unknowing" or "innocent facilitators" who "perform conduct

12

that is 'peculiar and necessary' to the criminal scheme," *id*. at 25 (quoting *United States v. Napoli*, 179 F.3d 1, 14 (2d Cir. 1999) (Sotomayor, J.)). To that end, Kent argues that the district court: (1) ignored the plain meaning of the Guidelines provision by considering other factors; (2) failed to perform the required head counting of knowing and unknowing actors; and (3) erred in any event because, despite the presence of four conspirators, in fact only two or three of them participated at any given time. The Government, though it agreed with Kent before the district court that Kent's criminal activity did not appear to be "otherwise extensive" within the meaning of § 3B1.1(a), counters before this Court that there was a sufficient factual basis to support the leadership enhancement.

For the reasons set forth below, we conclude that the district court erred in applying the § 3B1.1(a) enhancement. Although we disagree with Kent that under no circumstances may factors other than the number of knowing and unknowing participants in a criminal activity be considered, in determining whether the § 3B1.1(a) enhancement properly applies, we conclude that the district court's findings and explanation are inadequate, requiring that Kent's

13

sentence be vacated and that the application of § 3B1.1(a) be considered again on remand.

* * *

We begin with the Guidelines. Under § 3B1.1(a), a defendant is eligible for a four-level increase if he or she "was an organizer or leader of a criminal activity that involved five or more participants *or was otherwise extensive*." U.S.S.G. § 3B1.1(a) (emphasis added). Section 3B1.1, more broadly, "provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." *Id.* § 3B1.1(a) cmt. background. In assessing whether criminal activity is "otherwise extensive" for the purpose of § 3B1.1(a), the Guidelines commentary provides, "all persons involved during the course of the entire offense are to be considered." *Id.* § 3B1.1(a) cmt. n.3. For example, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.*

In *United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997), *abrogated in part on other grounds*, *United States v. Kennedy*, 233 F.3d 157, 160-61 (2d Cir. 2000), we

14

set out the "otherwise extensive" inquiry. We explained that "an adjustment under Guidelines § 3B1.1 is based primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity." *Id.* at 802. In determining the number of participants, a district court considers: (1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.[6] *Id.* at 803-04. With that, a district court can determine whether the scheme at issue was "otherwise extensive," that is, whether the scheme was "the *functional equivalent* of one involving five or more knowing participants." *Id.* at 803 (emphasis added); *see, e.g., Archer*, 671 F.3d at 166 (2d Cir. 2011) (affirming the application of a § 3B1.1(a) enhancement because it was

---

[6] We explained in *Carrozzella* that determining whether the services of an unknowing participant are peculiar and necessary to the scheme requires an examination of "the nature of the services provided." 105 F.3d at 804. Thus, while a perpetrator "anxious to close a fraudulent deal may occasionally have the crime in mind when hailing a cab to hurry to a meeting with victims," such "[l]awful services . . . are not peculiarly tailored and necessary to a particular crime but are fungible with others generally available to the public." *Id.* On the other hand, when a perpetrator organizes salespeople unknowingly to convey fraudulent misrepresentations on his behalf, the participation of such people in the criminal activity may properly count in favor of the § 3B1.1(a) enhancement. *See id.*

uncontested that there were at least three knowing participants and "a fair number" of unknowing participants, "the precise number being impossible to determine").

As we also explained in *Carrozzella*, even though § 3B1.1 adjustments are based primarily on the number of people involved in criminal activity, factors other than head counting "may be properly considered in the 'otherwise extensive' determination." 105 F.3d at 803. In doing so, however, a district court must ensure that it does not engage in impermissible double counting of offense level adjustments, as "many characteristics that might ordinarily be considered evidence of 'extensive' activity are dealt with elsewhere in the Guidelines."[7]  *Id*.  The *Carrozzella* panel stated that § 3B1.1(a) is limited "primarily to head counting or analysis analogous to that." *Id*. Moreover,

---

[7] "Impermissible double counting occurs [under the Sentencing Guidelines] when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Sabhnani*, 599 F.3d 215, 251 (2d Cir. 2010) (alteration in original) (quoting *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000)). We have made clear that "[m]ultiple adjustments are properly imposed, however, 'when they aim at different harms emanating from the same conduct.'" *Id*. (quoting *Volpe*, 224 F.3d at 76). In addition, *Carrozzella* recognizes in the context of § 3B1.1(a) that "some factors considered elsewhere in the Guidelines might still be properly counted toward 'extensiveness' in cases where the defendant's conduct . . . far exceeds the contemplation of the otherwise applicable Guideline," as when a crime resulting in a "$10 billion loss" is enhanced pursuant to a Guidelines provision as being over $80 million. 105 F.3d at 803.

"determining whether a criminal activity is 'otherwise extensive'" demands a showing that the activity is "the functional equivalent of one involving five or more knowing participants." *Id.* But the panel, contrary to Kent's position here, did not limit the district courts to head counting alone.

In the present case, the district court failed to consider the factors that we explained in *Carrozzella* are central to the § 3B1.1(a) inquiry: namely, the number of knowing participants and the number of unknowing participants organized by the defendant to render services peculiar and necessary to the criminal scheme. Here, Kent was a leader of a scheme involving only four knowing participants: Gottesman, Robinson, Matthews, and himself.[8] The district court stated that it was "not relying upon the five or more" portion, but rather on the "otherwise extensive" portion of the Guidelines provision. K.A. 115. Yet the district court did not find any facts regarding the number of unknowing participants organized or led by Kent. Nor is it clear from the record whether

---

[8] Kent's argument that there were fewer than four knowing participants because they were not all working at the same time is unavailing. Neither the Guidelines, nor the commentary, nor our precedent imposes a temporal limitation on counting the number of participants. To the contrary, the Guidelines commentary states that, "[i]n assessing whether an organization is 'otherwise extensive,' *all persons involved during the course of the entire offense* are to be considered." U.S.S.G. § 3B1.1(a) cmt. n.3 (emphasis added).

17

such unknowing participants existed and whether their services were peculiar and necessary to the scheme.[9]

To be sure, we do not require district courts robotically "to regurgitate the facts in the record" to satisfy the need for requisite consideration of the "count of the heads and the acknowledgment of the roles played." *United States v. Chacko*, 169 F.3d 140, 151 (2d Cir. 1999); *see also United States v. Manas*, 272 F.3d 159, 167 (2d Cir. 2001) (concluding that remanding for further fact finding is unnecessary where "the sentencing court speaks generally to the pertinent considerations and the specific facts are apparent from the record"); *Napoli*, 179 F.3d at 14-15 (noting that district courts are afforded "latitude" concerning their supervisory role findings and affirming application of a § 3B1.1 enhancement despite district court's failure explicitly to articulate the extent to which services of unknowing

_____

[9] The Government argues that "the trial evidence revealed several additional individuals who each provided services that were 'peculiar and necessary' to the conspiracy." Gov't Br. 43 (describing two individuals who were listed as references, a third who received funding, a fourth who provided input on writings, and a fifth who provided his signature on letters). But the Government concedes that "the District Court did not expressly reference these additional participants," arguing only that "their clear role in providing peculiar and necessary services to the conspiracy supports the District Court's conclusion." *Id.* at 44. Although the court indicated that it was relying on the PSR, moreover, the PSR does not mention any of the additional individuals that the Government now seeks to count. To the extent that evidence of these individuals was elicited at Gottesman's trial, the district court may consider on remand whether such evidence is sufficient to support the requisite factual findings necessary to support proper application of the leadership enhancement.

18

participants were "peculiar and necessary" to the criminal scheme). The district court in this case, however, eschewed this analysis entirely.

The district court did identify factors, other than the number of participants in the scheme, that it concluded supported application of the § 3B1.1(a) enhancement based on the following information contained in the PSR:

- Kent established or caused to be established the fake corporate entities.
- Kent developed the business model.
- Kent had a high degree of contact with the victims.
- Kent obtained most of the money, spreading it over a variety of entities and throughout the country. The court later explained that the number of victims and the amount of money was "about the reach, the reach over time, the reach over number of victims." K.A. 108. Those figures indicated "how far spread and how deep into the country this conspiracy and its harms went." *Id.*
- Kent worked with and led different co-conspirators at different points in time, and those individuals assisted Kent with various tasks. To that end, Kent was an organizer and instigator.
- Kent used various aliases.

As the *Carrozzella* panel suggested, some of these factors, while not directly involving head counting, "may be properly considered in [an] 'otherwise extensive' determination" as focused on the question whether a given criminal activity is "the *functional equivalent* of one involving five or more knowing participants." 105 F.3d at 803 (emphasis added). Although some of these factors could support the conclusion that Kent was a leader or organizer of the

19

scheme, other factors appear to have an unclear nexus to the "otherwise extensive" prong of § 3B1.1(a) or appear to be duplicative of factors already taken into account in calculating Kent's offense level. On remand, in addition to considering the number of knowing and unknowing participants organized by Kent in furtherance of the scheme, the district court should consider whether these factors are sufficiently related to the "extensive" nature of the scheme so as to support an enhancement under § 3B1.1(a).

To be clear, we do not opine here as to this analysis, leaving it in the first instance to the district court on remand. *Cf. United States v. Skys*, 637 F.3d 146, 158 (2d Cir. 2011) (remanding the case for resentencing in order "to permit the district court to supplement the record with appropriate factual findings" regarding the "involvement of four persons in addition to [the defendant] who were criminally responsible"). We simply conclude that the district court failed to conduct its § 3B1.1(a) analysis in light of our instruction in *Carrozzella* and that the role adjustment findings are presently inadequate to support application of this enhancement. We are unable to conclude on the instant record, moreover, that the errors identified here were harmless and "that the district court would have imposed the same sentence in any event." *Mandell*, 752 F.3d at 553

(quoting *Jass*, 569 F.3d at 68). To that end, a remand for Kent's resentencing is appropriate.

## CONCLUSION

For the foregoing reasons, Kent's sentence is **VACATED**, and his case is **REMANDED** to the district court for further proceedings consistent with this opinion.